GEORGE PIRICS et al.

v.

FIRST RUSSIAN SLAVONIC GREEK CATHOLIC BENEVOLENT SO-
CIETY, UNDER THE PROTECTORATE OF ARCHANGEL ST.
MICHAEL.

[Decided March 11th, 1914.]

1. Where the constitution and by-laws of a benevolent society were
promulgated contemporaneously in Russian and English, the fidelity of
the English text could not be questioned after many years, during which
the members had the right to rely on its accuracy.

2. Where, by the practical construction given the constitution and by-
laws of a benevolent society, the words "Greek Catholic," in the pro-
vision naming those eligible for membership, had been for almost twenty
years regarded as including members of the Russian communion, mem-
bers of that communion who had been admitted could not thereafter be
expelled on the ground that they were ineligible.

3. An amendment of the by-laws of a benevolent society excluding from
membership therein members of the Russian communion did not authorize
the expulsion of members of that communion who had been previously
admitted, as it could not have a retroactive effect.

4. The contract of a society organized to provide sick benefits, pay
funeral expenses, and help the widow or others left behind, with members
who pay an initiation fee and monthly dues, which are supplemented
from other sources, is not an ordinary contract of insurance, and the
rights of members unlawfully expelled are not to be decided as though it
were an insurance proposition.

5. An ordinary "contract of insurance" is defined as an agreement to
pay a given sum on the happening of a particular event, contingent upon
the duration of human life, in consideration of the immediate payment
of a smaller sum or a certain equivalent periodical payment.

6. The property of a society organized to provide sick and death bene-
fits is impressed with a trust for the uses of the society, but the trust is
for all the members, and none can be deprived of their interest therein,
except as provided in the by-laws.

7. Where a benevolent society has unlawfully expelled all those of a
certain class, and the remaining members, who are in the majority, de-
sire to continue the society, equity will not exercise its power to dissolve
it, but will decree a fair distribution of the property between the ex-
pelled members and those who remain.

8. Mandamus is the appropriate remedy to compel reinstatement of
members of a corporation who have been wrongfully expelled, but not in
the case of an unincorporated association.

9. Injunction will not issue to compel the reinstatement of a faction in a beneficial religious society who have been wrongfully expelled after much heat and violence, as to do so would not be consistent with equity.

*Mr. Sullivan* and *Mr. Dunn,* for the complainants.

*Mr. Lefferts* and *Mr. Joseph E. Stricker,* for the defendants.

STEVENS, V. C.

The bill is filed by fifty-two former members of the First Russian Slavonic Greek Catholic Benevolent Society, under the Protectorate of Archangel St. Michael, and prays for an injunction, a receiver and a division of the assets among the members of the society, and for further relief.

It appears that on May 2d, 1890, a number of persons of Slavonic origin met in Passaic and adopted a constitution and by-laws as an unincorporated society. This constitution and by-laws was printed in Russian and English. By section 3 of chapter 1 it was provided that "only men of Greek or Roman-Catholic faith and speaking some Slavonic language are admitted as members into the society." A number of the complainants were original members and all of them were members for five years prior to the filing of the bill on January 24th, 1912.

The complainants, with three or four others, who have been added, were and are members of the Russian Orthodox Church, while the remaining four hundred and sixteen members belong to the Roman Catholic Church. Harmony prevailed until the Russian Orthodox members obtained a priest of their own faith. After that there arose discords, culminating in violence, and the Roman Catholic majority expelled the Russian Orthodox minority on the ground that the latter were ineligible for membership. They took the position that by the words "Greek faith," in the section above quoted, was meant the faith of Greek Catholics who acknowledge the jurisdiction of the Roman pontiff and not the faith of those who recognize the Russian patriarch as their head. There was conflicting evidence of what was meant by the term "Greek" or "Greek Catholic" Church. Priests of the Russian Orthodox Church testified that it was commonly used to

designate their own communion, while priests of the Roman Catholic Church testified that it referred to a church existing in parts of eastern Europe, which was especially designated by that name and which acknowledged the jurisdiction of the pope. The fidelity of the English text found in the book containing the constitution and by-laws was attacked. But as it was promulgated contemporaneously with the Russian text, and as both the original members and those who became so afterwards had the right to rely upon its accuracy, I do not think it can now be questioned. Taking the view most favorable to the defendants the expression "Greek or Roman-Catholic" (the hyphen is in the original text) faith is at least ambiguous and by the practical construction given to it for nearly twenty years Russian Orthodox members were conceded to be eligible. It is too clear for argument that they could not after admission be expelled, because they were such. There were two attempted expulsions. After the first, which was without any ceremony, the by-laws were amended so as to exclude, in express terms, members of the Russian communion. A second attempt was then made to expel them on the basis of the amendment. It is plain that such a by-law could not have had a retroactive effect.

That the expulsion was unlawful was practically conceded when after a several days' trial the order of reference was agreed to. The question now to be resolved is whether the master's apportionment of the accumulated fund is correct in principle.

The society is a benevolent society. Its aim is stated in section 2 of chapter 1 as follows:

"Section 2. The aim of the Society is to help sick members and in case of death to give them a decent and Christian burial; also to help the widow or others left behind by paying to them the benefit as stipulated below, provided they are entitled to such a benefit."

By chapter 5 it is provided that no person can become a member unless he is more than eighteen and less than forty years old. By chapter 6 the initiation fees are to vary according to age from one dollar to five. The monthly dues were one dollar. Section 36 of chapter 7 reads as follows: "Each member of the society who has paid his one dollar regularly every month and kept the

rules of *this* by-laws is entitled to the *decided* benefit." A sick member was to have $5 a week. An unmarried man was to have a funeral costing $125 and be accompanied by a band. Members were to be entitled to death and accident benefits. This, without going into further details, will sufficiently indicate the character of an organization so prosperous that it has accumulated a fund of about $36,000.

The question is, how shall the complainants be made whole for their illegal expulsion? Shall they be compensated, as if this were what defendant's counsel calls "an insurance proposition," or shall they receive their fair proportion of what has been accumulated partly by their efforts and contributions? The master reports that the fifty-two expelled members had each an average membership of nearly fifteen years, while the remaining four hundred and sixteen members had, at the time of the expulsion, an average membership of only eight. Mr. Wolfe, the defendant's expert, computes the loss of the former (on the theory that this is "an insurance proposition") as amounting in the aggregate to $1,085.60, and this, counsel claims, is the limit of the society's liability. The wrong-doing majority, while only eight times as numerous, will, by such a method of computation, get more than thirty-four times as much of the fund as the wronged minority; and this, although the latter have been connected with the society on an average nearly twice as long as the former. The injustice of this result is alone sufficient to discredit it. The fallacy of the contention lies in the assumption that this is "an insurance proposition." In no proper sense of that term can it be so regarded. The members have indeed, by reason of the contract *inter sese* contained in the so-called constitution and by-laws, a right to benefits, but they have also by the same contract an interest in all the property. The ownership of the property of this unincorporated society resides in all the members. There is no provision in the constitution and by-laws which modifies this right.

That the contract of a beneficial society with its members is not ordinarily a contract of insurance was decided by the supreme court in *State* v. *Taylor, 56 N. J. Law 49, 715.* The constitution and by-laws of this society do not embody the ele-

ments of such a contract. The amounts paid in, in fees and dues, bear very slight, if any, relation to the amount to be paid in case of sickness or death. The death payment seems to be derived, in great part, from a special assessment of a dollar in the case of a member and of fifty cents in the case of a member's wife. Chapter 7, section 28. It is admitted that the fund has been increased by means of picnics, balls, &c. Chapter 12, section 91.

Chapter 12, section 90, provides that

> "the Society must have an annual convention on which they decide the most important thing and the biggest or smallest sick and death benefit. Or if the property of the Society fell under $500 the members must decide what to do further."

By the contract itself, therefore, the amount payable for sick and death benefits is subject to annual revision.

The ordinary contract of insurance is defined to be an agreement to pay a given sum on the happening of a particular event, contingent upon the duration of human life, in consideration of the immediate payment of a smaller sum· or a certain equivalent periodical payment. *Bliss L. Ins.* § 3. How different the contract in question!

The property of the association is, in a sense, as counsel argues, impressed with a trust for the uses of the association, but the trust is for all the members. How can some of the members deprive the others of their interest in it, unless in the manner pointed out in the by-laws? Can they thereby gain an advantage by their own wrong?

Equity, says Chancellor Runyon, in *Van Houten* v. *Pine, 36 N. J. Eq. ·134*, takes cognizance of the affairs of such associations and grants relief by treating them as partnerships or by looking into the scheme and compelling conformity to it or reforming or enforcing it; or if the plan is deemed impracticable decreeing a dissolution and distributing the funds and, speaking generally, it redresses as far as it can, the grievances of the members of these societies who complain to it of injustice affecting their pecuniary interests therein. *Bac. Ben. Soc.* § 441.

If, says Bacon (section 441),

"a bill is filed to distribute the funds of a voluntary association, formed for social and charitable purposes among its members, a decree will not be granted unless it clearly appears that its operations have ceased, its objects entirely failed and its purposes abandoned."

In these two passages lies the solution of the present controversy. This society has broken the contract among its members in a fundamental particular. It has ejected an entire class; the class of those who adhere to the Russian Orthodox communion. The larger class, however, those who adhere to the Roman communion, are in practical control and desire to perpetuate its existence. While it would be within the power of the court to dissolve the society, no such extreme measure is necessary. Justice can be done without distributing its assets *in toto*. The experienced master, aided by an actuary, has found, by a method he states in detail, which seems to me correct, that the fair share of the expelled members is $8,569.64, and that of the remaining members, $27,437.61. Considering the broad powers that a court of equity has exercised in this class of cases as far back as the time of Lord Eldon (*Pearce* v. *Piper, 17 Ves. 1; Beaumont* v. *Meredith, 3 Ves. & B. 180*), there would seem to be no reason why his recommendation should not be approved.

But it is argued that the complainants should have required reinstatement by *mandamus* or injunction. *Mandamus* is the appropriate remedy where the company is incorporated (*Sibley* v. *Carteret Club, 40 N. J. Law 295*), but not where it is not. In the latter case, injunction is said to be. *Bac. Ben. Soc.* § *442*. To compel warring religious factions to come together after so much heat and violence would not be consistent with equity. The court, having power to distribute the entire fund among the whole number of members, cannot lack power to distribute a part of it among a part of the members, if that appears to be the best way of disposing of the controversy. The propriety of some kind of distribution is admitted by the consent to the order of reference.

It is argued further that the order of reference is too narrow to admit of this disposition of the matter. The master is required, with the aid of an insurance actuary, to determine "what sum is due each of the complainants who are entitled to partici-

pate in the fund of the said society," * * * "regard being had" to four particulars, two of which the master and actuary have in view of the situation deemed unimportant. The real question was and is, what sum is due to those entitled to participate? The subordinate questions, propounded in the order, were added in order that they should not be lost sight of—not that they should be controlling.

That I may not appear to have overlooked the matter, I may say that the bill charges that the society was constituted as an unincorporated society on May 2d, 1890. The answer denies that it was unincorporated and alleges an incorporation on May 13th, 1890, under the name "First *Uhro*-Slavonic Greek Catholic Sick Benevolent *Church* Society of Archangel St. Michael," the underlined words not appearing in the constitution and by-laws. This shows their adoption on May 2d, and so precedes the alleged incorporation. Neither the name, nor apparently the object, the one being a benevolent, the other a benevolent *church* society, are the same and no proof is made by defendants either of their identity or even of the certificate of incorporation. Under these circumstances, the society cannot be treated as an incorporated one.

I think the master's report should be confirmed.