## JORDAN, Superintendent of Insurance, v. GROUP HEALTH ASS'N.
### No. 7260.

United States Court of Appeals for the District of Columbia.

Decided Sept. 11, 1939.

240

Elwood H. Seal, Corp. Counsel, and Vernon E. West, Principal Asst. Corp. Counsel, both of Washington, D. C., for appellant.

Heber H. Rice and E. K. Neumann, both of Washington, D. C., for appellee.

Before GRONER, Chief Justice, and EDGERTON and RUTLEDGE, Associate Justices.

RUTLEDGE, Associate Justice.

This is an appeal from a declaratory decree holding that appellee, herein called Group Health, "is not engaged in the business of insurance in the District of Columbia in violation of law and is not within the purview of any of the laws in said District relating to insurance companies." Appellant is the Superintendent of Insurance for the District, substituted on appeal for the original defendant, his predecessor in office, J. Balch Moor, now deceased. The then Acting United States District Attorney, David A. Pine, now District Attorney, also was a party defendant, contending that Group Health is engaged illegally in the practice of medicine. The judgment was adverse to both defendants, and the District Attorney has not appealed. Appellant contends that Group Health is either a health or accident insurance company within the meaning of Section 653 of the Code, D.C.Code 1929, tit. 5, § 179, or a company engaged in the business of insurance or an insurance company within the meaning of various other sections of the Code,[1] that it is carrying on its opera-

---

[1] D.C.Code 1901 §§ 646, 647, 650, 652, D.C.Code 1929, tit. 5, §§ 172, 173, 176, 178; D.C.Revenue Act of 1937, tit. 2, approved August 17, 1937, D.C.Code Supp. III, 1937, tit. 20, § 966; the Marine Insurance Act of the District of Columbia, approved March 4, 1922, D. C.Code 1929, tit. 5, §§ 184–215, 42 Stat. 401.

Section 653 of the Code, D.C.Code 1929, tit. 5, § 179 defines "health, accident, and life insurance companies or associations" (see note 12, infra), prohibits them from transacting business unless they possess certain assets "as a capital or guarantee fund", and provides for licensing and examinations by the superintendent.

tions illegally and without complying with the requirements of these statutes, and that the holdings and judgment below to the contrary were erroneous.

Group Health was incorporated on February 24, 1937, as a nonprofit corporation under Sections 121–126, Title 5, of the District of Columbia Code (1929), which authorize incorporation of associations for benevolent, charitable, scientific and other purposes, including mutual improvement.[2] The corporate objects, summarized, are to provide, without profit to the corporation, for medical services, preventive and curative, surgery, hospitalization, and medical and surgical supplies, exclusively for members of Group Health and their dependents.[3] Under the by-laws, membership is composed "solely of civil employees of the executive branch of the United States government service."[4] Members are elected by the Board of Trustees, who in turn are elected by the members except two chosen by the Federal Home Loan Bank Board,[5] all from the membership. Members may resign at any time, remaining

---

Section 646 requires insurance organizations to file copies of charter, articles of incorporation or association, and certificates of authority to do business with the superintendent. Section 647 requires the filing of annual statements of financial condition; Section 650 requires filing statements and other acts; Section 652 requires the superintendent to see that insurance companies or associations possess the assets required by law or by charter. The Revenue Act of 1937 requires annual license and fee of $25 therefor for mutual, fraternal and other insurance organizations, imposes a percentage tax on net premium receipts, dues, et cetera. The Marine Insurance Act authorizes formation of and regulates companies to write accident and health insurance, exempting those operating under Section 653.

[2] "Any three or more persons * * * who desire to associate themselves for benevolent, charitable, educational, literary, musical, scientific, religious, or missionary purposes, including societies formed for mutual improvement or for the promotion of the arts, may make, sign, and acknowledge," et cetera. (Sec. 121)

[3] As stated in the Certificate of Incorporation: "To provide, without profit to the corporation, for the service of physicians and other medical attention and any and all kinds of medical, surgical and hospital treatment to the members hereof and their dependents, and the construction and operation of a clinic and medical office building, and the construction and operation of a hospital in the manner permitted by law, for the members hereof and their dependents, and the operation of a drug store or pharmacy, and the providing of nurses and of drugs and remedies for the members hereof and their dependents, and the furnishing of all forms of hospital service and attention to the members and their dependents, and in general the giving to the membership of this association and their dependents of all forms of care, treatment or attention that may be required by the sick or in the prevention of disease."

[4] Art. II, Sec. 1: "The corporation shall have no capital stock but shall be an association controlled by its members. The membership of this corporation shall be composed solely of civil employees of the executive branch of the United States Government service; provided, however, that in case persons other than employees of the Federal Home Loan Bank Board and agencies under its direction shall be designated as eligible for membership, such action shall first have approval of a majority of the Board of Trustees."

The Certificate of Incorporation provides: "The membership of the corporation shall be composed solely of employees of any branch of the United States Government service other than officers and enlisted men of the United States Army and Navy." (Sec. 4) However, the uniform practice has been to limit membership to the more restricted scope prescribed by the by-laws, and no point is made in argument of the charter provision.

[5] Employees of the Home Owners' Loan Corporation, while subject to the general regulations concerning membership, service, et cetera, appear to occupy special status in some respects. This is by virtue of a contract made on March 22, 1937, between Group Health and the Corporation, by which the former undertook to provide physical examination of applicants for employment with the Corporation, before employment, to supervise its provisions for emergency treatment of its employees, and "to cooperate in providing a substantially complete medical and hospital service to its employees and their families, all in the interest of the acquisition and maintenance of the highest possible type of personnel, which in the judgment of the Corporation is necessary for the accom-

liable for thirty days' dues, and failure to pay dues for sixty days terminates membership. There are two classes of membership, family membership and individual membership. For the latter, dues are $2.20 monthly; for the former, $3.30 (now, as appears from appellee's brief, slightly more).

Control and management of corporate affairs are vested in the Trustees, who may expel a member for cause on notice and hearing. The Trustees serve without compensation. On dissolution of the company, they are empowered to liquidate its assets, wind up its affairs, and distribute remaining proceeds to members in good standing.

Group Health issues no policies, formal certificates or contracts, but does give membership cards to its members for purposes of identification. Members' rights to services are fixed by the certificate of incorporation and the by-laws, principally the latter, including various amendments made from time to time. In return for the monthly dues, Group Health undertakes to arrange for medical and surgical services[6]

to be rendered by independent practitioners, not full-time staff members,[7] either at the clinic maintained by Group Health or, if necessary, at the home of the member or the hospital where the patient may be. Hospitalization is by arrangement with established independent hospitals, for a maximum of twenty-one days for any one illness.

The petition alleges that the contracts with physicians and others are made by Group Health "on behalf of its members", but they are not made on the occasion of each call or case, and do not purport to obligate the member to pay the physician for the service,[8] or as a principal normally is bound in commercial transactions by his agent's agreements on his behalf. The contract between Group Health and the physician undoubtedly enters into and fixes some aspects of the legal relation between him and the member. But in this respect its role is more nearly analogous to that of a collective labor agreement in the individual contract of the union member and the employer (entering into it so as to fix some of its terms, but not others) than to

plishment of the purposes of the Corporation"; in consideration of which the Corporation agreed to pay Group Health $10,000 on request and $833.33 monthly for twelve months from the date of beginning service, thereafter $1,666.67 monthly for twelve months.

By subsequent contract, dated February 23, 1938, the Corporation agreed to (and did) anticipate all the monthly payments provided for in the previous agreement, by paying the full amount in cash, in return for Group Health's agreement to continue its services for two years from November 1, 1937, to such employees of the Corporation "as care to join it on a reasonable monthly prepayment basis."

6 They are both preventive and curative. The service rendered to members who are employees of the Home Owners' Loan Corporation includes physical examination at the time of application for employment. The regular services include medical and surgical examinations and treatments, including "examinations in special departments, such as refractions of eyes, laboratory tests, X-ray examinations, surgical operations, confinement cases, and professional consultations, nursing and ambulance facilities, house calls, and hospitalization * * * not to exceed 21 days for any one illness"; but not treatment of industrial

accident cases, surgery of the brain and certain other excepted treatments.

Members are required to pay for medicines, drugs, surgical appliances, eyeglasses, radium and deep X-ray treatments, dental work, blood transfusions, hospitalization in excess of the usual 21 days, and certain other items; which, however, the corporation undertakes to "make an effort to secure at reduced prices."

7 The physicians apparently devote only a portion of their time to the work of Group Health, the remainder being devoted to private practice, although it seems to be contemplated that some physicians will give full time to the work. They receive fixed annual compensation, paid in monthly instalments, not specific fees for each treatment or case. The contracts between Group Health and the physicians at present are oral, terminable on short notice, though a proposed form of written contract has been submitted to the local Medical Association for approval. Group Health formerly maintained its own staff of full-time salaried physicians, working under its direction, but this practice has been discontinued.

8 So far as the usual service not excepted by the by-laws is concerned. As to other services, the matter of payment is left, apparently, to private arrangement.

the ordinary contract of a principal made by his agent. The physicians and hospitals look solely to Group Health for their compensation as to the services it undertakes to arrange for. Nor is the cost of service rendered to an individual member limited by or apportioned to his contributions. For $26.40 a year, an individual member may receive much, little or no service. In effect the plan is one by which the members by making regular, limited payments receive service and supplies in variable degrees according to their needs, within specified limitations. Although this is the practical operation and effect of the plan, it is important to note the exact nature of the obligations assumed by Group Health to its members. These are contained, so far as the record shows, exclusively in the by-laws, which, in their amended and presently controlling form, have been drawn with extreme care. The pertinent provisions are set out in the margin.[9]

The effect of the agreement or arrangement is to *make available* to members, if they wish to receive them, the services of the physicians contracted for by Group Health; but it is specifically provided that (1) Group Health cannot and will not regulate or control the physician in his work—he is left free, in fact required, to exercise his own judgment entirely independently as to diagnosis and treatment; (2) the only obligation which Group Health assumes toward its members is to *make contracts,* of the character described, with physicians and others—there is no agreement or binding obligation to provide the service or see that it is supplied; the undertaking is to contract for the rendition of the services by independent contractors, not to supply them at all events or con-

[9] They appear chiefly in Article X, to which reference is made unless otherwise noted:

"Section 5. The Trustees shall have the right to determine and modify the extent of the service to be furnished to members at any time they may decide to do so upon written notice to the members to that effect given fifteen (15) days prior to any such change."

"Section 5 [Article V]. The Board of Trustees shall contract for and in behalf of the members of this corporation, with physicians duly licensed to practice their profession in the District of Columbia, who shall render such service to the members as may be provided in said contract. One of said physicians shall be designated as the Medical Director, who, with the approval of the Trustees, may engage the services of such assistants, orderlies, nurses, or other help, in order to properly render the services contracted for."

"Section 6 [Article V]. The Board of Trustees shall in no way regulate or supervise the practice of medicine by any physician with whom it contracts for the care of members nor shall it in any way supervise, regulate or interfere with the usual professional relationship between such physician and his patient member, and every such contract entered into by and between a physician and the corporation shall contain a positive covenant to that effect."

"Section 1. The contract or contracts to be made by this corporation on behalf of the members thereof with physicians, as provided in Section 5 of Article V, or with others, shall provide for the fol-

lowing services to members:" [enumerating the items summarized in note 6, supra.]

"Section 2. The contract or contracts to be made by this corporation on behalf of the members, with physicians, as provided in Section 5 of Article V of these By-Laws, or with others, shall not provide for the following services to members;" [enumerating]

"Section 3. Any contract entered into by the corporation on behalf of its members will require the members to pay for the following:" [enumerating; cf. note 6, supra.]

"Section 4. (a) The corporation does not guarantee that it will provide any or all of the services above specified and for which it will attempt to contract on behalf of its members and it shall not be liable to any member or his dependent in any manner whatever if it should for any reason, including lack of funds, be unable to procure any or all of said services when called upon to do so.

"(b) The corporation does not guarantee that any physician or physicians with whom it may enter into a contract to render services to its members will perform such contract and its only obligation in the event of the breach of such contract by any physician shall be to use its best efforts to procure the needed services from another source.

"(c) The corporation shall not be liable to its members or their dependents for any act of omission or commission on the part of physicians or other persons with whom it may contract for the rendition of services to its members and their dependents."

tingently; (3) further, the Trustees may determine or modify the extent of service so made available (presumably as to *all* members collectively) at any time on fifteen days' written notice; (4) the Medical Director may determine the extent of the services which will be available to members *in each individual case*; (5) the corporation does not guarantee that any of the services will be rendered, or that any contracting physician will perform his contract to supply them; (6) the corporation assumes no liability for his failure to do so or for any act of omission or commission by him in doing so or for any breach of his contract; and (7) finally, Group Health assumes no liability, if for any reason it becomes unable to procure any or all such services when called upon to do so, or to indemnify the member for failure of the physician to keep his agreement or perform it properly, and its only obligation in such a case is *"to use its best efforts* to procure the needed services from another source." This is the basic contract relating to the primary service. In addition, Group Health arranges for limited hospitalization, by what specific terms does not appear, and itself furnishes facilities and services in connection with its clinic, all of which are merely incidental to the primary services and must stand or fall with them.[10]

Tenuous the obligation may be, but that does not render it illegal, or make of it a contract of insurance or one of indemnity. Correlatively tenuous is the member's responsibility to Group Health.[11] The attenuated character of the literal obligation on both sides is pertinent here, not to its essential fairness or to any question of sufficiency of consideration or mutuality of obligation (no member now questions it), but to the issue or issues before us, namely, whether the agreement is a contract of insurance or one "for the payment of indemnity on account of sickness or accident." In our view it is neither.[12]

█ It is unnecessary for us to attempt formulation of an all-inclusive or exclu-

---

[10] Appellant singles out the feature of hospitalization for special condemnation. It is clearly incidental in the general scheme as are Group Health's clinical and other services rendered directly. They constitute facilities with which the primary task is done. We think the plan must be taken as a whole, not split up into disconnected parts.

[11] His payments are small and he does not contract to make them for any definite period except that on resignation dues continue for thirty days, during which he continues to receive the advantages of membership.

[12] The argument as to the exact nature of Group Health's legal position with reference to the various statutes takes varied forms. Appellant contends, first, that it is a "health, accident, and life insurance company or association" as such organizations are defined in Section 653, that it has not complied with the requirements of that section but is engaging in business in violation of its terms. The definition contained in the section is as follows:

"Every corporation, joint-stock company, or association not exempt herein, transacting business in the District of Columbia, which collects premiums, dues, or assessments from its members or from holders of its certificates or policies, and which *provides for the payment of indemnity on account of sickness or accident*, or a benefit in case of death, shall be known as 'health, accident, and life

insurance companies or associations.'" [Italics supplied.]

A proviso exempts relief associations in this language: *"And provided further,* That nothing contained herein shall apply to any relief association, not conducted for profit, composed solely of officers and enlisted men of the United States Army or Navy, or solely of employees of any other branch of the United States Government service, or solely of employees of any individual, company, firm, or corporation."

Other sections of the Code relating to insurance companies and engaging in the business of insurance, relied upon by appellant (see note 1, supra), do not define either such companies or such business.

Appellant contends that in the absence of a statutory definition relating to these sections, Group Health is "engaged in the business of insurance *as generally defined*", i. e., at common law, "and hence, comes within the other provisions of law relative to the regulation, licensing and control of insurance companies." [Italics supplied.] No other section of the Code relied upon by appellant purports specifically to make exemptions such as Section 653 contains, except the Marine Insurance Act, which exempts companies operating under section 653, and, therefore, presumably, the companies exempted by its terms, and the Revenue Act of 1937 (tit. 2, § 8, D.C.Code Supp. III, 1937, T. 20, § 966, subsec. 8) which con-

sive definition of insurance or of indemnity, or to distinguish them sharply.[13] While the basic concepts are not identical and each has varied legal usages, they have common and primary elements which are controlling here. Fundamentally each involves contractual security against anticipated loss. Whether the contract is one of insurance or of indemnity there must be a risk of loss to which one party may be subjected by contingent or future events and an assumption of it by legally binding arrangement, by another. Even the most loosely stated conceptions of insurance and indemnity require these elements. Hazard is essential and equally so a shifting of its incidence. If there is no risk, or there being one it is not shifted to another or others, there can be neither insurance nor indemnity. Insurance also, by the better view, involves distribution of the risk,[14] but distribution without assumption hardly can be held to be insurance.[15] These are elemental conceptions and controlling ones.

How are they to be applied to Group Health's plan of operations?

As to the preventive phase of its work and some others, it does not appear that any hazard is involved. The examination of persons seeking employment with the Home Owners' Loan Corporation cannot be regarded even remotely as involving risk to others or assumption thereof by Group Health. So with its supervision of that organization's first aid service. The examination of and consultation with members who are in health, not ill, and all that large phase of its work designed to prevent rather than to treat illness, hardly can be said to involve risk of it, certainly not assumption of that risk or of the loss caused when it falls. This is prevention of hazard, not payment for the loss when it strikes. This phase of the plan is not slight or insubstantial, or, therefore, to be ignored in determining the basic question. As we have said,[16] it is the plan as a whole, not artificially disjointed and segregated single

tains an exemption similar to that of section 653.

On the other hand, Group Health denies that it is a "health, accident, or life insurance company or association" within the definition of section 653; contends that if it is found to be such it is within the specific exemption of the proviso as a relief association; asserts, further, that the definition of section 653 is the one exclusively applicable to the organizations comprehended by it, whether with reference to that section or any other provision of the Code; and therefore that general judicial definitions of insurance are not applicable to it or to any of the sections of the Code so far as they may affect it. Presumably the contention includes the view that since the definition of section 653 is imported into the other sections, likewise its exemptions are imported into them.

In the view we take of the case, we do not find it necessary to determine whether the definition contained in Section 653 is confined in its effect to that section, or is imported into the other sections relied upon by appellant, or the further question whether the exempting proviso of that section likewise is confined to its prohibitions or is extended to those of the other sections.

[13] Each word, "insurance" and "indemnity", is used in a great variety of situations and with meanings which vary according to that in hand. General definitions torn from the context of specific facts and legal issues do not help greatly, often merely confuse. Some are so all-covering as to embrace nearly the entire law of contract. Cf. (1937) 23 Corn.L.Q. 188, 193.

The court below considered the question here to turn on the meaning of "payment" as used in Section 653 (cf. note 12, supra). Payment, it held, ordinarily means "the payment of money". Since no money is paid here to the member, the plan falls outside the statute's definition. Cf. Pirics v. First Russian, etc., Society, 1914, 83 N.J.Eq. 29, 33, 89 A. 1036, 1038; Brownell v. Board of Education, 1925, 239 N.Y. 369, 374, 146 N.E. 630, 632, 37 A.L.R. 1319, cited with other cases (1939) 52 Harv.L.Rev. 809, 814, note 34. Appellant says this view is too narrow, that indemnity may be paid in cash or in kind or in any event by paying cash to a third person for the benefit of him indemnified. Without indicating disagreement with the trial court's view (cf. 52 Harv.L.Rev. 809, 814), we think there are more substantial reasons to sustain the result; and that emphasis, for the purposes of this case, should be placed on the word "indemnity" in Section 653 rather than on "payment".

[14] See Vance, Insurance, 2d ed. 1930, p. 2; Home Title Insurance Co. v. United States, 2 Cir., 1931, 50 F.2d 107, 110, affirmed 1932, 285 U.S. 191, 52 S.Ct. 319, 76 L.Ed. 695; 23 Corn.L.Q. 188 (1937).

[15] Cf. authorities cited and discussed in notes 29–44, infra.

[16] Note 10, supra.

phases of it, with which we are concerned.[17] Certainly it was not this sort of activity at which the definition in Section 653, or the insurance regulations of the District, if they be separable from it, were directed.

But what of the service to the sick or injured? Here certainly is risk, hazard which has descended.[18] But has it been shifted to or assumed by Group Health? On this question the exact nature of its obligation becomes important. Does it assume the risk, or contract to bear the member's loss when it falls? Is it obligated to pay, in cash or in kind, to him or to another for his benefit or for that of a beneficiary designated by him the amount by which he is damaged or any amount? Unless the by-laws are to be discarded and ignored entirely, there can be only one answer. The agreement is not to pay to the member or to any one else *the amount of loss* which is caused to him. True, the physician receives his salaried compensation. But he receives no more and no less because of the falling of the loss. He is not a beneficiary; nor is he an agent of· the member; in an inaccurate; non-technical sense, he, rather than Group Health, is the one more nearly analogous to an insurer. If incidence of illness in the group is light, so is his work; if heavy, so is his labor up to the maximum of his contract. In either case his compensation is the same. Nor is the burden of Group· Health increased normally by the falling of particular losses. Its obligation to the physician remains the same. That to particular members is not at all affected by the volume of illness ,in the group whether great or small. As a matter of good faith, of fulfilling moral expectations, in epidemic conditions it undoubtedly would expand the arrangements for service temporarily, so far as its resources would permit. Siz-

able increase in membership would cause it likewise to enlarge ·the number of physicians under contract, so as to make the service generally and normally available. But this would not expand the obligation or the liability to any particular member. In any event, whatever the emergency or the experience, it undertakes not to supply the service, or see or guarantee that it is supplied, or be responsible for the failure to supply it or to do so properly, but only to "use its best efforts" to secure similar service from another source.

Tested by the nature of the member's right of recourse against Group Health for breach of its contract with him, the matter becomes clear. Possibly he could succeed on showing no reasonable effort by it to contract with physicians or others to render the stated services; or that it was negligent in selecting incompetent ones; or that it did not "use its best efforts" to make alternative arrangements. But barring some such showing, his attempt to recover would be in the teeth of his contract. This is not assumption of risk or hazard. It has not the sound or the sense, technically or in lay conception, of "insurance" or of "indemnity". If it resembles anything, the analogy is rather to "agency" or representative action, or to that of an intermediary of more independent status. The contract is, in fact, unique. It does not fit neatly into established categories of "agency", "guaranty", "insurance", "indemnity" and the like. As has been said, it bears some relation to a collective labor agreement.[19] In a broad sense, such an agreement may be considered as one of "indemnity" against unemployment or other hazards covered by its terms. Yet no one would contend that because the employer fails to live up to his contract with the union, it would be rendered liable to its member injured by his

---

[17] It is on this basis, undoubtedly, that statutes generally and, in their absence, courts exempt "relief" departments or associations from operation of the laws regulating the business of insurance. Having regard only to the "relief" phases of their programs, it is difficult if not impossible to distinguish them technically or practically from health, accident and life insurance. Regarding them merely as one phase of the business of operating a railroad or a manufacturing company, designed to promote efficiency of personnel and discharge the full duty of the employer to the employee in cre-

ating a real security for the latter, puts them in an entirely different light and discloses the incongruity of applying to them regulations 'designed to apply to entirely independent businesses of insurance. Cf. Vance, Insurance, 2d ed. 1930, p. 61. The same considerations underlie the usual exemption of insurance activities of fraternal beneficial associations.

[18] Cf. State ex rel. Fishback v. Universal Service Agency, 1915, 87 Wash. 413, 151 P. 768, 772, Ann.Cas.1916C, 1017, discussed infra.

[19] See text, supra, circa notes 8 to 9.

breach, or that the union, because it makes contracts to this extent on behalf of and for the benefit of its members, becomes as to them an "insurer" or "indemnifier" against the risk of such a contingency. The mere fact that the agreement has for its object the safeguarding of the worker from some of the uncertainties and insecurities of unemployment does not place it or the labor relations and risks with which it deals under the regulations pertaining to insurance and indemnity; so with this arrangement.

The same conclusion is dictated by the plan's practical operation and effect. Although Group Health's activities may be considered in one aspect as creating security against loss from illness or accident, more truly they constitute the quantity purchase of well-rounded, continuous medical service by its members. Group Health is in fact and in function a consumer cooperative. The functions of such an organization are not identical with those of insurance or indemnity companies. The latter are concerned primarily, if not exclusively,[20] with risk and the consequences of its descent, not with service, or its extension in kind, quantity or distribution; with the unusual occurrence, not the daily routine of living. Hazard is predominant. On the other hand, the cooperative is concerned principally with *getting service rendered* to its members and doing so at lower prices made possible by quantity purchasing and economies in operation.[21] Its primary purpose is to reduce the cost rather than the risk of medical care; to broaden the service to the individual in kind and quantity; to enlarge the number receiving it; to regularize it as an every-day incident of living, like purchasing food and clothing or oil and gas,[22] rather than merely protecting against the financial loss caused by extraordinary and unusual occurrences, such as death, disaster at sea, fire and tornado. It is, in this instance, to take care of colds, ordinary aches and pains, minor ills and all the temporary bodily discomforts as well as the more serious and unusual illnesses.[23] To summarize, the distinctive features of the cooperative are the rendering of service, its extension, the bringing of physician and patient together, the preventive features, the regularization of service as well as payment, the substantial reduction in cost[24] by quantity purchasing, in short, getting the medical job done and paid for; not, except incidentally to these features, the indemnification for cost after the service is rendered. Except the last, these are not distinctive or generally characteristic of the insurance arrangement. There is, therefore, a substantial difference between contracting in this way for the rendering of service, even on the contingency that it be needed, and contracting merely to stand its cost when or after it is rendered.[25]

That an incidental element of risk distribution or assumption may be present should not outweigh all other factors. If

---

[20] Medical activities of insurance companies, many having admirable consequences for public and individual health, are carried on at most as an incident of insuring against the risks assumed, not as the basic purpose or object of the corporation or association.

[21] It has been found that twenty percent of the physician's time is expended unproductively in waiting for patients. Reed, Health Insurance, 90 (1937).

[22] Appellant makes no point of Group Health's purchase and distribution of medical supplies. Commodity cooperatives have an advantage over service ones in respect to the contingency element in that they can purchase in advance of need and store goods. Services bought in advance must be rendered when needed.

[23] Regularity and frequency of recurrence of need reduce the element of contingency, and therefore its importance in relation to other elements in the arrangement. As medical care increases emphasis upon prevention of illness and treatment of minor ills, it reduces correspondingly the risk of serious illness and its relative importance in a well-rounded program.

[24] See the studies of the Committee on Costs of Medical Care, Final Report, 1932, Medical Care for the American People, particularly at page 133; also New Plans of Medical Service (Julius Rosenwald Fund, 1936); Levy and Mermin, Cooperative Medicine and The Law, (1938), 1 Nat. Lawyers Guild Q. 194, 197–200.

[25] This is shown practically by the fact that health insurance policies generally do not provide for the rendering of medical service or deal with prevention and cure. Disability provisions replace to a limited extent the earning power lost by illness. But their design is security against the financial consequences of illness, not primarily to prevent it or get medical service done.

attention is focused only on that feature, the line between insurance or indemnity and other types of legal arrangement and economic function becomes faint, if not extinct. This is especially true when the contract is for the sale of goods or services on contingency. But obviously it was not the purpose of the insurance statutes to regulate all arrangements for assumption or distribution of risk. That view would cause them to engulf practically all contracts, particularly conditional sales and contingent service agreements. The fallacy is in looking only at the risk element, to the exclusion of all others present or their subordination to it. The question turns, not on whether risk is involved or assumed, but on whether that or something else to which it is related in the particular plan is its principal object and purpose.[26]

■ It is admitted that the identical plan and service rendered here would not be "insurance" or "indemnity" if offered by an organization owned, operated and controlled by physicians.[27] It would then be a contract "for service on contingency", though the same element of risk and avoidance of its possible consequences would be present. We do not see how it is material to the size or relative importance of the element of risk and its assumption in the plan that the business control is in lay rather than professional hands. If the plan is for "service", not "insurance", in the one case, we think it is in the other. With differences such as have been pointed out, the application of statutory regulations designed to fit the one to the operations of the other could not be other than incongruous, or fatal to the cooperative. It would result, not in regulation, but in destruction of the organization.[28]

Whether, therefore, the decision is made on the technical legal character of the arrangements, the letter of the bond, or on a practical consideration of the functions performed by Group Health and the methods used by it in performing them, it properly cannot be brought within the laws relating to insurance or to organizations providing "for the payment of indemnity on account of sickness or accident".

We think these conclusions are sustained by the authorities which are pertinent. No good purpose would be served by an extensive review of cases dealing with multitudinous types of organization and function holding them to be or not to be engaged in some form of insurance business.[29] Only a very few deal with the specific issue presented here, namely, whether consumer cooperatives are so engaged, particularly when they assume only the abbreviated obligations which Group Health undertakes. Those to which we have been referred are favorable to the view we take, none to the contrary.[30] The case most closely in point is Fishback v.

---

[26] "Care must be taken to distinguish mere contracts to render service on the happening of a contingency from true contracts of insurance. * * * The cases have failed to declare a satisfactory rule for distinguishing between the two types of agreements, but it would seem that the contract should not be classed as insurance if the paramount purpose in its formation was to be the rendition of the services rendered. * * * However, it should be insurance if the chief purpose of the agreement is the protection against the risk involved. * * *" (1936) 3 U. of Pittsburgh L.Rev. 250, 251–252 and notes 7–12; (1939) 52 Harv.L.Rev. 809, 814, n. 37; and note 41, infra.

[27] Cf. 25 Ops. of the Atty.Gen. (Wis.) 192 (1936).

[28] Cf. notes 39–44, infra, and the textual discussion of the authorities there cited.

[29] Cf. the annotations in 63 A.L.R. 711 and 100 A.L.R. 1449; and note 41, infra.

[30] The closest approach, where litigation has been prolific, is found perhaps in the cases relating to burial associations, in which of course the element of contingency, the lack of regularized service, and the opportunity as well as the practice of trading on credulity and fear are much greater. Death strikes only once. But even as to these there is some conflict (Cf. 63 A.L.R. 711, 723), though the majority of the cases classify such arrangements as insurance. They are clearly not in point here, however, as the obligation assumed is a definite and binding one to supply the service. Many of them also involve businesses operating for profit, frequently in the disguise of a "non-profit association", which is in fact an adjunct of an undertaking concern. Cf. Oklahoma Southwestern Burial Association of Ardmore v. State ex rel. Read, Insurance Commissioner, 1928, 135 Okl. 151, 274 P. 642, 63 A.L.R. 704, and notes 36, 37, 38 and 40, infra. Cf. also State v. Spalding, 166 Minn. 167, 207 N.W. 317, discussed note 41, infra.

Universal Service Agency, 1915, 87 Wash. 413, 151 P. 768, 772, Ann.Cas.1916C, 1017. In many respects the plan followed by Group Health has been modeled on the one sustained there. There are slight technical differences in the arrangements,[31] but the basic features are identical.[32] That case, in some respects, was stronger for application of appellant's contention than this.[33] Yet the court held unanimously that the Agency was not engaged in doing an insurance business or subject to the insurance statutes. The want of any hazard or peril, definitely assumed by the Agency, was the basis for the decision.[34] There, as here, reliance was placed on the Physicians' Defense Company Cases;[35] as well as on State ex rel. Fishback v. Globe Casket Co.[36] The former involved contracts to supply legal defense to physicians in malpractice suits; the latter a provision for burial. The court distinguished them, saying:

"There was in those cases a contract for indemnity against a hazard which might cause the physician loss, but, as we have attempted to show, no hazard or peril is insured against by the contract in the case at bar. So with the case cited from this court. There was an insurance against loss to the beneficiary of the insured. We cannot therefore think them conclusive, *or even in point* in the case at bar. [Italics supplied.]"[37]

Without indicating approval of the results in the cases distinguished,[38] we think the distinction sound and controlling here.

In Hall D'Ath v. British Provident Asso., [1932] 48 Times L.R. 240, it was held that the English statutes regulating insurance were intended to apply only to concerns organized for profit and not to charitable or non-profit associations contracting for definite benefits in case of sickness. This, of course, goes beyond what is necessary in this case;[39] but it

---

[31] The Universal Service Agency made its agreements with members or "subscribers" and with physicians, pharmacists and others on elaborate forms drawn on an "agency" theory. The physician's compensation was a specified share of each member's payments, to be paid over to him within a stated time following receipt by the Agency, not a fixed annual sum.

[32] Both organizations were consumer cooperatives. Both agreed with members merely to contract with physicians and others to render the service, not to do so themselves or see that it was done; both left the physician free to do the work in his own way; both collected specified and limited regular payments from members in advance of service; paid the physicians out of the funds so received; limited their right to payment to such funds; clearly stated in the agreements with members that they assumed no liability for breach of the physician's contract, and agreed only to "use their best efforts" to procure the services from another source.

[33] It was in quo warranto by the Commissioner of Insurance under a statutory definition of insurance much broader than that of health and accident indemnity companies in Section 653 of our Code. The Washington Insurance Code, L.1911, c. 49, p. 161, § 1 defined "insurance" as: "A contract whereby one party called the 'insurer', for a consideration, undertakes to pay money or its equivalent, or to do an act valuable to another party, called the 'insured', or

to his 'beneficiary', upon the happening of the hazard or peril insured against whereby the party insured or his beneficiary suffers loss or injury."

Also, the provisions of Group Health's by-laws against its liability to members are stronger than were those of Universal Service Agency's contracts with its members.

[34] 151 P. at page 772.

[35] Physicians' Defense Co. v. O'Brien, 1907, 100 Minn. 490, 111 N.W. 396; Physicians' Defense Co. v. Cooper, 9 Cir., 1912, 199 F. 576, 47 L.R.A.,N.S., 290. Cf. note 38, infra.

[36] 1914, 82 Wash. 124, 143 P. 878, L.R.A.1915B, 976. Cf. note 30, supra.

[37] See note 34, supra.

[38] That in the Physicians' Defense Co. cases has been criticized by distinguished authority [cf. Vance, Insurance, p. 61, relating to Physicians' Defense Co. v. O'Brien, 1907, 100 Minn. 490, 111 N.W. 396, where there was a strong dissent by Lewis, J.], and there is contrary authority: Vredenburgh v. Physicians' Defense Co., 1906, 126 Ill.App. 509; State ex rel. Physicians' Defense Co. v. Laylin, 1905, 73 Ohio St. 90, 76 N.E. 567. In none of these cases was the organization a non-profit corporation.

[39] It is commonly assumed that it is immaterial, in the United States, for application of the insurance statutes, that the corporation is organized as one not for profit. No doubt this is due largely to the generally prevailing specific statutory exemptions of fraternal beneficial associations and relief associations, and

does support the view, pertinent here, that statutes designed to regulate the business of insurance or that of indemnity, growing out of experience with and evils developing in them, were not intended for application to all organizations having some element of risk assumption or distribution in their operations.[40] This is evidenced by decisions in this country exempting various types of agreements involving such elements from operation of the insurance laws and by conflict in the decisions as to others, a few illustrations being given in the margin.[41] It becomes

the widespread adoption of special statutes to regulate the activities of the former. These make it difficult for the question to be presented. It has been asserted that only one other case than the present one [People ex rel. Courtney v. Association of Real Estate Taxpayers, 1933, 354 Ill. 102, 187 N.E. 823] has involved a non-profit corporation where the charge has been "practicing medicine". (1939) 52 Harv.L.Rev. 809, 813, n. 29.

[40] Cf. id. at p. 815; and Lewis, J., dissenting in Physicians' Defense Co. v. O'Brien, 1907, 100 Minn. 490, 111 N.W. 396: "The statutory definition of insurance is comprehensive, but it does not follow that all contracts which contain a technical element of indemnity are insurance contracts. The statute should be read in the light of the development of insurance law, and the purpose of requiring insurance companies to become subject to the examination and control of the state. * * *" Page 398 of 111 N.W.

[41] Cf. comments and authorities cited, (1937) 23 Corn.L.Q. 188; (1939) 52 Harv.L.Rev. 809, 814–817; (1930) 29 Mich.L.Rev. 378; (1938) 1 Nat.L.Guild Q. 194, 206–211; (1937) 3 U. of Pittsburgh L.Rev. 250; and notes 17, 26, 30, 35, and 38, supra. Apart from the conflicts as to legal defense of physicians sued for malpractice (note 38, supra) and burial associations (note 30, supra), the courts divide squarely on servicing plate glass windows with replacement of broken glass, People v. Roschli, 1937, 275 N.Y. 26, 9 N.E.2d 763, cf. (1937) 23 Corn.L. Q. 188; People v. Standard Plate Glass & Salvage Co., 1916, 174 App.Div. 501, 156 N.Y.S. 1012, holding the contract insurance; contra, Moresh v. O'Regan, 1936, 120 N.J.Eq. 534, 187 A. 619, reversed on jurisdictional grounds, 1937, 122 N.J.Eq. 388, 192 A. 831, 194 A. 156. Cleaning bicycles, repairing and replacing them when damaged accidentally or stolen were held not to be insurance, but service or cooperative purchasing, in Commonwealth v. Provident Bicycle Ass'n, 1897, 178 Pa. 636, 36 A. 197, 36 L.R.A. 589. In Allin v. Motorists' Alliance, 1930, 234 Ky. 714, 29 S.W.2d 19, 71 A. L.R. 688, a contract to supply legal services for defense and prosecution of claims arising from operation of automobiles was held one of insurance; but the opinion distinguished Commonwealth v. Provident Bicycle Ass'n, supra, as "a cooperative arrangement among bicycle owners which is quite a different thing from the contract" there involved. It expressly reserved decision concerning activities of motor clubs, like A. A. A., said to be "in the nature of cooperative service among the members of the clubs." See also other instances in the authorities cited in the comments cited supra and in 63 A.L.R. 711 and 100 A.L.R. 1449. The varying and confused results bear out the statement that the courts have failed to declare a satisfactory rule for distinguishing insurance from service on contingency and other agreements involving commingled elements of risk assumption or distribution and other objectives. Cf. note 26, supra. But, regardless of this confusion, most, if not all, of the cases are distinguishable from the present one, some in many features such as predominance of the risk element over all others, absence of cooperative interest and action, profit-seeking, open or disguised, but all by the definite assumption of contractual liability for the risk involved.

The single case to the contrary which we have discovered is State v. Spalding, 1926, 166 Minn. 167, 207 N.W. 317. Though in that case the members' obligation to pay assessments was left to the "application of conscience", the court rightly found the defendant soliciting agent obligated to apply the funds reaching his hands to the purposes set forth in the certificate, which was indemnification of the owners of Ford cars against loss from theft, collision, accidents and other risks. The primary object of the entire plan was the avoidance of loss arising from highly contingent events, not the securing of regularized service at low cost. On the other hand, Hampton v. Toxteth Cooperative Provident Society, Ltd., [1915] 1 Ch. 721, involved a cooperative association granting death benefits proportional to members' purchases during the three years preceding death. By its charter, the society had power to dispose of its capital and income as it pleased, and this "insurance fund" was created from income. The society advertised "free insurance". The court held the plan not insurance, but mere allocation of income which the society could make in its discretion, and could re-

the more evident when the purpose and nature of many of the statutory requirements are considered, particularly those relating to the maintenance of reserves or "guarantee funds" and to the regulation of investments and financial operations The object of these is protection of the insured and thus of the public against the insurer.[42] They assume separateness of identity, with consequent diversity of ownership and possible antagonism of interest between them,[43] as well as definite assumption of liability, legally enforceable, by the insurer to the insured. Such requirements can have meaning, purpose and useful effect only in relation to definite and binding obligations as to which, in their absence, there is danger of default. They are entirely inappropriate where no such risk is assumed, no danger of default can exist, and the control rests ultimately, as here, in the hands of those to whom the very limited obligation runs. Imposition of the requirements in such circumstances would be not only useless, but an economic waste. It is not the function or purpose of Group Health to pile up vast accumulations of capital to await the needs of a distant day; it is rather to keep a steady flow of funds, with as small a margin as possible, running from patient to physician as nearly contemporaneously with the reverse flow of service from physician to patient as can be. It is a distributing, not an accumulating agency. To require it to maintain a guarantee fund of $25,000 or of $100,000, in accordance with the provisions of Section 653,[44] would be to divert funds from its primary purpose and keep them in idleness to no end of security for its members. These consequences we are confident the Congress did not intend when it enacted Section 653, or the other insurance laws of the District.

We think also that Group Health

falls clearly within the exempting proviso of Section 653[45] and the similar, though more extensive[46] one of the Revenue Act of 1937. It is not disputed that it is a "relief association, not conducted for profit." Both from the language of the section and its asserted purpose, however, appellant contends that, in view of Section 1, Article 2, of the By-Laws,[47] its membership extends beyond that permitted by the proviso. The question is whether Group Health's membership is composed "solely of employees of any other *branch* of the United States Government Service" than the Army or Navy. The by-laws limit membership to "civil employees of the *executive* branch of the United States Government Service", and purport to include employees of the Home Owners' Loan Corporation within that category. Members of the military services and employees and members of the legislative and judicial branches of the Government service, as well as all other persons not connected with the executive branch, are excluded. Appellant says, however, that the word "branch" is used in a less extensive meaning, not as designating the entire executive branch (excluding the military services) in the constitutional sense as distinguished from the legislative and judicial branches, but something less. Just what unit is intended does not appear with clarity from the argument, although it is asserted that Congress intended to exempt "only *the comparatively small and inconsequential* relief associations composed solely of officers and enlisted men of the United States Army, those composed solely of officers and enlisted men of the United States Navy, and those composed solely of employees of any other single *department or independent agency* of the Government. It did not intend to exempt an as-

---

call at any time. There was no contractual duty to pay benefits if the fund were insufficient or withdrawn.

[42] Cf. (1939) 52 Harv.L.Rev. 809, 815.

[43] These, of course, are much greater in an organization operated for profit of the "owners" and controlled by them than in a non-profit association owned and controlled by those who constitute also its "market".

[44] It would be interesting, in view of the character of Group Health's obligations, to speculate upon how the appellant would determine whether it should deposit $25,000 or $100,000 under the criteria prescribed by Section 653 for

making this determination. The latter figure is prescribed when the company undertakes a weekly indemnity of more than $20.

[45] See note 12, supra, for the exact language.

[46] In addition to the associations exempted by Section 653, the Revenue Act exempts those composed solely of employees of the government of the District of Columbia and fraternal organizations issuing contracts of insurance exclusively to their own members.

[47] See note 4, supra, for the exact language.

sociation which would or could include within its membership all of the civil employees of the executive branch of the government." [Italics supplied] It is contended that, in any event, the employees of the Home Owners' Loan Corporation are not employees of the executive branch.

We do not find these arguments convincing, or sustained either by the language or by the clearly apparent purpose of the proviso. The idea that only "small and inconsequential" associations were intended to be exempt is negatived both on the face of the proviso and in the light of its purpose as disclosed by the commonly known facts regarding other organizations clearly exempted. An association composed of all of the officers and enlisted men of the Army, or one similarly composed from the Naval service, would not be "small or inconsequential" [48]. Nor would one composed "solely of employees of the District of Columbia government", as provided in the Revenue Act of 1937. One made up "solely of employees of any individual, company, firm, or corporation" might consist of 50,000, 100,000 or more members. In fact, this provision covers literally, and we think purposively, the so-called "relief departments" of railroads, manufacturing and mercantile establishments, existing commonly when the act was passed and now, many having extensive memberships.[49] In the light of these facts, arguments based on a strained and narrow construction of language from emphasis upon particular words are not convincing, especially since equally effective contentions can be made in the same way for the contrary view. We think that the evident and dominant purpose of the exemption, apparent from all of its provisions, was to exempt organizations, whether large or small, for other considerations than mere size. The exemptions were intended for relief activities which would be incidental

to a more basic relation, that of employment, whether it comprehends many or few. It was the check provided by the employment relation, on management and control, on profit, on membership, on abuses, not the size of the employer or the number employed, which was the basis of the exemption. Furthermore, limitation of the exemption to "small and inconsequential" units very possibly would have the effect, practically, of nullifying it. Numbers are important for sound insurance. Expensive duplication of overhead and equipment would be required. The exemption was designed to encourage, not to prohibit, employee relief, whether by self-organization or by cooperative arrangement of employees and employer. We are not required to decide whether an association composed solely of employees "from the civilian branches of the government service" would be within the exemption, as appellee contends. Clearly none of Group Health's members comes from the legislative or the judicial departments. We think an association limited to employees of the executive branch, as distinguished from the legislative and the judicial, is clearly within both the letter and the spirit of the exemption.

For the purposes of the exemption the employees of the Home Owners' Loan Corporation are and should be held to be employees of the executive department.[50] It is true that for some purposes the organization is a separate entity by specific authorization of Congress;[51] but that does not remove it from the executive department or render its functions non-governmental, hence non-executive, in character. It is doing work essentially of the executive department, is subject to its supervision and control through the Federal Home Loan Bank Board and the Department of the Treasury,[52] and its employees are not more segregated from other execu-

---

[48] As of June 1, 1939, there were approximately 12,573 officers and 165,591 enlisted men in the Army. For the Navy the comparable figures were 10,603 and 109,457.

[49] The Pennsylvania Railroad Voluntary Relief Department is open to employees of five different railroad and terminal corporations, parts of the Pennsylvania system.

[50] Commonwealth ex rel. Kelly v. Rouse, 1935, 163 Va. 841, 178 S.E. 37, holding an employee of the corporation to be an employee of the United States un-

der a statute denying state employment to federal employees.

[51] 48 Stat. 129, 1933, 12 U.S.C. § 1463 (1934) 12 U.S.C.A. § 1463.

[52] The corporation is stated expressly to be "an instrumentality of the United States * * * which shall be under the direction of the Board and operated by it under such by-laws, rules and regulations as it may prescribe for the accomplishment of the purposes and intent of this section." 48 Stat. 129 (1933), 12 U.S.C. § 1463 (1934), 12 U.S.C.A. § 1463. The Secretary of the Treasury is required

tive employees than those of the Department of State, for instance, are from employees of the Department of Labor. The word "corporation" as used in the exemption ("or solely of employees of any individual, company, firm or corporation") obviously refers to private concerns, not to governmental agencies, at any rate if they are included within the preceding classifications.

By virtue of the exemption, therefore, Group Health is relieved from the requirements of Section 653 and of Section 8, Title 2 of the Revenue Act of 1937. As stated previously, we do not find it necessary to decide whether the exemption or the definition of health and accident insurance companies contained in Section 653 has any effect upon the regulations prescribed by other sections of the Code relied upon by appellant. Apart from any specific exemption, its business is not that of insurance so as to bring it within those sections.

No contention is made from the fact that dependents as well as members receive service. In view of the almost universal practice of relief associations and departments, we regard this as properly within the function of relief to the member.

Appellant argues also that Group Health "is not authorized under valid provisions of its charter to engage in the business of insurance." The contention, so put, may be admitted. The argument, however, appears to challenge the validity of Group Health's incorporation. If it were engaged in the business of insurance or indemnity, and not specifically exempted from the regulations pertaining to them, appellant would have standing to raise the question. He has no standing to challenge generally and without regard to features of insurance or indemnity, the validity of appellee's incorporation.

Appellant visualizes serious consequences for the effective regulation of insurance activities from a decision such as we have reached. We do not share his concern. Experience to date with consumer cooperatives, organized and limited in their activities, management and membership as is Group Health, has not shown that they are susceptible to the abuses feared. If they or others should appear, measures for their control should be enacted by the legislature, not prescribed through judicial expansion of existing statutes designed for other organizations' activities and abuses.

The decree is affirmed.

---

to approve various actions of the Board, 47 Stat. 725, 1932, § 6 (a) and (f), 12 U.S.C.A. § 1426(a, f), and has other powers relating to its operations and those of member banks. The Board has free use of the mails, its examiners qualify and serve with the same powers and under the same requirements as those of national banks and the Federal Reserve system. The Government guarantees the corporation's bonds, and transactions by the Treasury in them are required to be treated "as public-debt transactions of the United States." 12 U.S.C. § 1463 (c), 12 U.S.C.A. § 1463(c). The conflict regarding the corporation's liability in tort [cf. (1939) 24 Iowa L.Rev. 772] is not controlling in the face of so many governmental attributes. Cf. Keifer & Keifer v. Reconstruction Finance Corporation, 1939, 306 U.S. 381, 59 S.Ct. 516, 83 L.Ed. 784.