

# THE ATTORNEY GENERAL
## OF TEXAS
### AUSTIN 11, TEXAS

**WILL WILSON**
**ATTORNEY GENERAL**

December 11, 1962

This Opinion
Affirms Opinion

#O-4986-A

Mr. William A. Harrison
Commissioner of Insurance
International Life Building
Austin 14, Texas

Opinion No. WW-1475

Re: Whether, under the facts
stated, Prepaid Prescription
Plan, Inc. would be engaging
in the business of insurance
in furnishing the prescrip-
tion service required by its
service agreements and
pharmacy contracts, and
related questions.

Dear Mr. Harrison:

You have asked our opinion as to whether or not the business
proposed to be conducted by Prepaid Prescription Plan, Inc. is an insurance
business. In this connection you point to Attorney General's Opinion No.
O-4986-A dealing with a somewhat similar problem and ask whether or not
it is still in effect and, if so, whether or not it is correct.

In your request you outline the facts to be considered as
follows:

"The Prepaid Prescription Plan, Inc., is a domestic corpora-
tion chartered August 4, 1959, under the Texas Business Corpor-
ation Act. The Purpose Clause of its Articles of Incorporation
provides as follows:

"'ARTICLE THREE: The purposes for which the corpora-
tion is organized are:

To establish, maintain and operate a prepaid prescrip-
tion plan or plans whereby prescriptions, either oral
or written by duly licensed physicians, may be dis-
pensed by duly licensed pharmacists to individuals,
either singly or in groups, who become subscribers
thereto:

And in furtherance thereof to enter into contracts
with duly licensed pharmacists who are authorized
to dispense prescriptions in compliance with the laws
of the state in which they do business, whereby such
pharmacists agree to provide such prescription ser-
vice to its subscribers.'

"Membership for a subscriber and/or his dependents is available on a group plan or a pay direct plan upon making application for enrollment on an application form furnished by the company, payment of service fees, and upon acceptance of such application by the company and the issuance of Service Agreement. Membership for a pharmacy in the plan may be obtained by submitting application on a form furnished by the company, payment of membership fee, and execution of Pharmacy Contract. Copies of both type applications and a copy of the Service Agreement and Pharmacy Contract are enclosed herewith for your information as to the exact terms of these instruments.

"The Prepaid Prescription Plan, Inc., is a stock company with the stockholders being the owners of the corporation and entitled to receive profits upon their investment in the stock.

"For and in the consideration of the payment of the monthly service fee provided for in the Service Agreement a subscriber, after obtaining a legal prescription from a licensed physician, may have the prescription filled by any Member Pharmacy and pay one-third or one-half of the prescription selling price according to the Service Agreement. Prescriptions may be obtained from other than a Member Pharmacy only under certain conditions as set out in the Service Agreement after securing approval of the pharmaceutical director of the company. The company pays directly to the Member Pharmacy the two-thirds or one-half the price of the prescription, as the case may be, which is computed and based upon a schedule of prices as provided for in the Pharmacy Contract. The "prescription selling price" upon which the subscriber's one-third or one-half is computed may be different from the price upon which the company's two-third or one-half is computed.

"The Prepaid Prescription Plan, Inc., acts as an agent for the subscriber and for the member pharmacist but specifically assumes no liability for the performance of the Member Pharmacy."

Insurance has been defined in Ware v. Heath, 237 S. W. 2d 362, (Civ. App. 1951), as: "An undertaking by one party to protect the other party from loss arising from named risks, for the consideration

and upon the terms and under the conditions recited" citing Couch's Cyclopedia of Insurance Law, Vol. I, page 2., As stated in National Auto Service Corporation v. State, 55 S. W. 2d 209, (Civ. App. 1932, error dism.) : "Whether or not a contract is one of insurance is to be determined by its purpose, effect, contents, and import, and not necessarily by the terminology used, and even though it contain declarations to the contrary. . . " We have concluded that under the facts presented Prepaid Prescription Plan, Inc. , hereinafter referred to as the corporation, will be conducting an insurance business.

Examining the contracts furnished us in connection with the opinion request, it can be seen that the benefit to the holder of the service agreement is the obtaining of prescription drugs at a reduced rate, the difference between the amount paid by the subscriber to the pharmacy and the actual sale price being paid to the pharmacist by the corporation.[1] The risk insured against is the possibility that the subscriber's doctor, during the period covered by the service agreement, might see fit to prescribe drugs for his treatment, the filling of which prescriptions would entail an expenditure by the subscriber. In the event of serious illness to the subscriber, he conceivably could be financially unable to purchase the necessary drugs at the current market price. After entering into the service agreement in question, a portion of this risk is distributed to the corporation, for it has agreed (by virtue of the contract between it and the subscriber and between it and the member pharmacy) in consideration of the monthly payment of $1. 50 or $1. 60 (depending on whether or not a group or an individual is a contracting party) to reimburse a member pharmacy a portion of the price of each prescription filled by the pharmacy for the subscriber. The contingency upon which the payment rests is the filling by the pharmacy of a prescription written by a doctor and submitted to the pharmacy by a subscriber to the Plan. It will be noted that the pharmacy takes no risk. It is completely reimbursed, partly by the subscriber and partly by the corporation -- in some respects analogous to deductible hospitalization policies. On the other hand the corporation, organized for profit, is gambling that its cost for prescriptions filled

---

1/ As pointed out in your opinion request, the prescription selling price upon which the subscriber's payment is computed may be different from the price upon which the corporatinn's payment is computed. This , however, is not material to the question presented.

for its subscribers will be less than the amount taken in through the monthly payments.

We can find no cases in this or other jurisdictions passing upon arrangements exactly the same as that herein involved. It resembles in some respects and is presumably based upon medical plans previously passed upon by the courts of certain other jurisdictions, primarily the group health or group medical plans which came into vogue during the depression. The earliest case in this general field is State ex rel. Fishbach v. Universal Service Agency, 151 Pac. 768, (Wash. Sup. 1915), which was an action by the insurance commissioner of the State of Washington to forfeit the charter of the Universal Service Agency for doing an insurance business without complying with the insurance regulations. The agency entered into contracts with a pharmacist, a doctor, a grocer, and a shoe dealer, the dealers contracting to sell their products at a fixed rate or a fixed discount and the doctor contracting to render medical service for a fixed consideration. The agency also entered into contracts with individuals for the fixed sum of $15.00 per year plus $5.00 for each child covered by the agreement. The products purchased from the dealers were paid for by the individuals purchasing same and the doctor's compensation was a fixed amount out of each membership fee and did not vary with the treatments rendered. The agency assumed no liability for breach of the contract by the doctor or the dealers. The court held that the agency was not in the insurance business because it was insuring against no peril. It can be seen that the arrangement is not the same as that passed upon in this opinion, for the agency obviously assumed no risk that the payments it was called upon to make would exceed the amount which it was taking in from the contract holders.

There are also in existence a group of opinions dealing with group medical plans which are epitomized by the opinions in California Physicians' Service v. Garrison, 172 P. 2d 4, (Cal. Sup. 1946), 167 ALR 306, and Jordan v. Group Health Association, 107 F. 2d 239, U. S. Court of Appeals, (1939). In both, the formation of the particular type of corporation involved was authorized by statute, both were non-profit and both encompassed group service only. In the Garrison case the subscriber's dues amounted to $1.70 (male) and $2.00 (female) a month. The doctors contracted with the service to make available their medical services in return for a payment on a unit basis, i.e., a pro rata distribution of the dues collected for that month, depending upon the amount of service which they rendered. In the Jordan case, the doctors were paid a fixed annual compensation. In both cases the business was held

not to be insurance in nature. As pointed out in the Jordan opinion, the corporation assumed no risk and acted only as an agent. If any risk was assumed it was assumed by the doctor. There was no possibility in either case that the cost to the service or group association for the services rendered by the doctors would exceed the amount taken in in monthly dues.

To the same effect is the case of Commissioner of Banking and Insurance v. Community Health Service, Court of Errors, New Jersey, 30 A. 2d 44 (1943). The stipulated facts in that case were to the effect that the defendant corporation contracted with doctors for one year periods for fixed consideration the amount of which varied with the number of individual contract holders but not with the amount of service rendered. The court held on the authority of the Fishback case that this was not an insurance business. Of interest to the question before us is the fact that the state contended that the amount of compensation to be paid to the doctor depended upon and would vary with the amount of services rendered regardless of the amount of dues taken in. The court clearly pointed out that it had been stipulated that the compensation was fixed and that the amount of the service rendered would not affect in any way the compensation paid by the service to the doctor. The converse of that situation, of course, is the one with which we are dealing.

Even in the group health field, however, some jurisdictions have held these arrangements to constitute insurance. This is true in the case of Cleveland Hospital Service Association v. Ebright, Court of Appeals of Ohio, 45 N. E. 2d 157, affirmed by the Supreme Court of Ohio, 49 N. E. 2d 929 (1943), even though the particular type of corporation was specifically authorized by statute. In that case the amount to be paid to the hospital by the Service Association varied with the amount of service rendered. The opinion reads in part as follows:

"The advantage to the subscriber, if he invokes the benefits of his contract, requires payment in money which is definitely measured by the extent of service rendered to the subscriber by the hospital to which he elects to go. It is payable upon a contingency, namely, that it is certified by his attending physician that the subscriber requires hospitalization. . . The contract, in probability, is not to indemnify the subscriber because the hospital which he selects does not extend credit to him and, therefore, there is no primary liability on his part which would be essential to make the service association an indemnifier. The amount which is paid by the subscriber is a charge based upon an

actuarial determination of the probable risk incurred in issuing the contract, although that which is provided the subscriber upon the happening of a contingency is so far as he is concerned, service, yet it is measured by a money consideration payable to the hospital because of the rendering of that service to the subscriber on behalf of the plaintiff association. "

The group of cases holding that group medical service contracts do not constitute insurance have been attacked insofar as the legal soundness of their reasoning is concerned by law review articles which are, however, favorable to the concept of group health service. For example, the writer in 53 Yale L. J. 162 in speaking of the Jordan case criticizes the failure of the court "to recognize the underlying risk--distribution function of prepayment--to insure the potential patient against the unpredictable occurrence of sickness." Likewise, in 52 Harvard Law Review 809 appears the following: "And while the distinction between contracts for services and contracts of insurance is sometimes shadowy, it seems clear, that in the case of cooperative health associations, indemnification against medical cost rather than the unique services of the physician is the principal object of the relationship. "

These principles seem even more applicable to a corporation for profit of the type with which we are here concerned. We, therefore, conclude that the plan of operation intended to be followed by Prepaid Prescription Plan, Inc. , would involve the doing of an insurance business in this state.

This opinion conflicts in no way with the holding in Opinion No. O-4986-A. The facts which were at that time before this office and which are revealed in the opinion itself, show that the health service was of the cooperative type, squarely within the holding of the Jordan case above cited. We, therefore, affirm the holding of that opinion.

## SUMMARY

Under the facts stated, Prepaid
Prescription Plan, Inc., would
be engaging in the business of
insurance, in furnishing the
prescription service required
by its service agreements and
pharmacy contracts.

Very truly yours,

WILL WILSON
Attorney General of Texas

By _____
DUDLEY D. MC CALLA
Assistant Attorney General

DDM:ms

APPROVED:

OPINION COMMITTEE:

W. V. Geppert, Chairman

Vernon O. Teofan
J. Gordon Zuber
Bob E. Shannon

REVIEWED FOR THE ATTORNEY GENERAL BY:

Leonard Passmore