739 P.2d 1365

**JIM CLICK FORD, INC., a California corporation, Plaintiff/Appellant,**

v.

**CITY OF TUCSON, an Arizona municipal corporation, Defendant/Appellee.**

No. 2 CA–CV 5850.

Court of Appeals of Arizona, Division 2, Department A.

Aug. 4, 1987.

Stompoly & Even, P.C. by L. Anthony Fines, Tucson, for plaintiff/appellant.

Frederick S. Dean, Tucson City Atty. by Michael G. Wood, Tucson, for defendant/appellee.

OPINION

FERNANDEZ, Judge.

Jim Click Ford, Inc. (Click) appeals from the summary judgment entered in favor of the City of Tucson in Click's suit for a tax refund and for a declaratory judgment that the tax assessment imposed on Click's sales of vehicle service contracts was improper and impermissible. Both parties moved for summary judgment on the claim for a refund, and the trial court granted the city's motion. The parties then stipulated that the ruling disposed of the case, and Click appealed. We reverse.

Click sells motor vehicles in Tucson. When it sells a vehicle to a customer, it sometimes also sells the customer a vehicle service contract which covers the repair and replacement of various parts of the automobile in the event they are defective or malfunction. The contract becomes effective at the time the manufacturer's warranty expires. When the contract is sold, the customer signs a service contract application which states that the contract will be mailed to the customer by Kelley Blue

Book. The application also states as follows: "The undersigned customer acknowledges that Kelley Blue Book is not party to the Service Contract. Customer agrees to look solely to Dealer as the party responsible for the monies received and services to be rendered to customers under the Service Contract." In addition, the application form indicates that the dealer has an insurance policy in force which guarantees performance of the dealer's obligations under the contract.

Pertinent provisions of the vehicle dealer service contract itself read as follows:

> Within the terms and conditions of this contract the selling dealer agrees that in the event of any defect or malfunction he will repair or replace any parts covered by this contract within a reasonable length of time subject to the availability of parts.
>
> \* \* \* \* \* \*
>
> Claims must be submitted by the buyer to the issuing dealer.
>
> \* \* \* \* \* \*
>
> All claims must have prior approval by Kelley Blue Book before any work is started.
>
> \* \* \* \* \* \*
>
> This service contract is published and administered by Kelley Blue Book. However, Kelley Blue Book does not guarantee the performance of the services covered by this contract. We (the selling dealer) assume all responsibility for the performance of this contract.
>
> The customer acknowledges that Kelley Blue Book is not a party to this Service Agreement. Customer agrees to look solely to dealer as the sole responsible party for the monies received and services to be rendered to customer under this agreement.

Under the service contracts, a purchaser pays a one-time price which covers the cost of parts and labor for replacement of any listed part which malfunctions during a specified period of time (or a specified number of miles, whichever occurs first) after the manufacturer's warranty expires. The customer pays only $25.00 on each covered unit when repairs are performed under the contract.

According to the affidavit submitted by Click in connection with the cross-motions for summary judgment, when a customer purchases a service contract, Click forwards the purchase price to Kelley Blue Book, an underwriter. If repairs are performed under the contract, Click submits a bill, which is separately itemized as to labor and parts, to Kelley Blue Book who then pays Click. Those activities occur as the result of a separate contract between Click and Kelley Blue Book. That contract is not involved in this appeal.

When Click sold service contracts to customers, it did not charge them sales tax. When the city audited Click's books, it assessed Click $45,172.28 for taxes on service contracts sold between November 1, 1981 and October 31, 1984. After Click's administrative challenge to the assessment was unsuccessful, it paid the tax under protest and filed suit for a refund in July 1985. The trial court granted the city's summary judgment motion on March 19, 1986, and this appeal followed the denial of Click's motion for reconsideration.

## EXEMPTION FROM TAXATION AS INSURANCE CONTRACTS

Section 19.85(1) of the Tucson City Code imposes a tax of two percent on the gross proceeds of sales or gross income from the business upon every person engaged in the business of selling any tangible personal property at retail. Click contends that the service contracts it sold are in fact insurance contracts and are thus exempt from taxation under IR2–6 of the Official Rules and Regulations for Administration of Business Privilege License Tax, which specifically excludes insurance policies from the definition of tangible personal property. Click argues that the contracts are insurance contracts because the price of the contract insures that repairs will be performed during the term of the contract and because all covered repairs are paid regardless of their total cost.

In support of its argument that the vehicle service contracts constitute insurance

contracts, Click relies on *Guaranteed Warranty Corp. v. State ex rel. Humphrey*, 23 Ariz.App. 327, 533 P.2d 87 (1975). In that case, the state director of insurance sought an injunction to prevent Guaranteed Warranty from acting as an insurer without having first obtained an insurance license. Guaranteed's marketing approach was to establish dealerships with independent retailers of television sets and to encourage the retailers to also sell a Guaranteed contract when they sold television sets to customers. In its contracts, Guaranteed agreed to replace picture tubes which failed because of a manufacturing defect after the manufacturer's warranty expired. In holding that the contracts were insurance contracts so that Guaranteed was required to have an insurance license, the court identified five elements of an insurance contract: "1. An insurable interest 2. A risk of loss 3. An assumption of the risk by the insurer 4. A general scheme to distribute the loss among the larger group of persons bearing similar risks 5. The payment of a premium for the assumption of risk." 23 Ariz.App. at 330, 533 P.2d at 90.

In analyzing those five elements with regard to the vehicle service contracts in question here, we conclude that the purchasers of the contracts have an insurable interest in the automobiles which the contracts cover and they also have a risk of loss if one of the listed parts malfunctions. Click assumes the risk and replaces the parts involved. The loss is distributed among a larger group with similar risks, since it is obvious that some of the purchasers will require a large number of replacement parts and services during the contract term, while there are others who may not require any and some who may require only a few. Finally, a premium (the purchase price of the contract) is paid in exchange for Click's assumption of the risk of loss. Clearly, the five elements of an insurance contract are present in the vehicle service contracts.

The city argues that the contracts fail to meet either element of the definition of insurance given in A.R.S. § 20–103(A): "a contract by which one undertakes to indemnify another or to pay a specified amount

upon determinable contingencies." We agree that the contracts do not call for payment of a specified amount when the listed parts malfunction. However, they do serve to indemnify the purchasers with regard to malfunction of any of those listed parts. The definition of "indemnify" is "[t]o restore the victim of a loss, in whole or in part, by payment, repair, or replacement. To save harmless; to secure against loss or damage; to give security for the reimbursement of a person in case of an anticipated loss falling upon him." Black's Law Dictionary 692 (5th ed. 1979). Under the contracts, Click is required to restore the victim of a loss by replacement of a listed part or parts. When a part malfunctions on a purchaser's car, Click replaces it, and all the purchaser pays is $25. Thus, the purchaser's loss is partially restored. The contracts, therefore, fall under the definition of insurance in § 20–103.

The city also contends that the contracts do not constitute insurance because their principal purpose is to provide services, not indemnity, citing *Transportation Guarantee Co. v. Jellins*, 29 Cal.2d 242, 174 P.2d 625 (1946). In that case, the California Supreme Court stated as follows:

> The question turns, not on whether risk is involved or assumed, but on whether that or something else to which it is related in the particular plan is its principal object and purpose. In the *California Physicians' Service [v. Garrison]* case it is held that (28 Cal.2d 790, 172 P.2d [4 at] 16.) 'Absence or presence of assumption of risk or peril is not the sole test to be applied in determining * * * status. The question, more broadly, is whether, looking at the plan of operation as a whole, "service" rather than "indemnity" is its principal object and purpose.'

29 Cal.2d at 249, 174 P.2d at 629. One of the contracts at issue in that case provided that the contractor would maintain the vehicle for a 40,000–mile period. That maintenance included providing all required gas, oil, grease, tires, mechanical repairs, body repairs, a wash once a month, and a paint job once a year as well as paying state and city license fees, paying for insurance cov-

erage and furnishing garage space. That contract is nothing like the contracts involved here. The contractor there performed all necessary periodic maintenance on the vehicle in addition to replacing parts. There was no doubt the contractor would perform services and incur costs under the contract. In the contracts in question here, however, Click may never perform any services under some of the contracts and may perform only a few under others. No regular maintenance of any kind is covered by the contracts; indeed, the purchasers are required to produce maintenance records when replacement parts are requested to show that they have properly maintained the cars according to the manufacturer's schedules. The purchasers pay the cost of that required maintenance.

In a case in which the issue was whether or not a contract constituted the "business of insurance," the United States Supreme Court held as follows:

'Whether the contract is one of insurance or of indemnity there must be a risk of loss to which one party may be subjected by contingent or future events and an assumption of it by legally binding arrangement by another. Even the most loosely stated conceptions of insurance ... require these elements. Hazard is essential and equally so a shifting of its incidence.'

*Group Life & Health Insurance Co. v. Royal Drug Co.*, 440 U.S. 205, 228, 99 S.Ct. 1067, 1081, 59 L.Ed.2d 261, 278 (1979), quoting *Jordan v. Group Health Association*, 71 App.D.C. 38, 44, 107 F.2d 239, 245 (1939). If no vehicle service contract were entered into here, the purchaser would be liable for the cost of replacing any listed part. By the payment of a premium, the purchaser contracts to limit his or her liability for such losses to the contract price plus the $25.00 deductible. On the other hand, absent the contract, Click would have no obligation to replace the parts. Under the contract, it assumes the purchaser's liability by spreading the risk of loss among the other purchasers. The purchase price is established with an eye toward covering anticipated losses while still resulting in a profit to Click. The city contends that the concept of either insurance or indemnity requires the existence of a pre-existing obligation and that none exists here when one examines the service contract alone. We disagree. The pre-existing obligation which Click assumes in the contracts is the purchasers' obligation to replace the parts themselves.

We note also that vehicle service contracts are regulated under A.R.S. § 20–1095.01, which is part of the state insurance code. That section provides that a service company may not offer or issue a service contract unless the director of insurance has issued a permit to the company. A service company is defined as a person who performs services pursuant to a service contract. A.R.S. § 20–1095(7). Section 20–1095.02(B) provides that a motor vehicle dealer who sells a service contract program which has been approved by the director of insurance is exempt from any further requirements of Article 11 of Title 20. Under § 20–1095.06 the director must approve motor vehicle service contract programs if they are insured by mechanical reimbursement insurance. " 'Mechanical reimbursement insurance' means an insurance policy issued to a motor vehicle dealer to insure the performance of a motor vehicle service contract to a consumer if the motor vehicle dealer or the service contract administrator becomes insolvent or ceases to do business." § 20–1095(4). Although we do not have a copy of the contract between Click and Kelley Blue Book, we presume that it constitutes mechanical reimbursement insurance.

We conclude that the vehicle service contracts are a form of insurance policy. Sales of the contracts are thus exempt from the city's transaction privilege tax. Since we have determined that the contracts are insurance contracts, we do not address Click's argument that the Tucson City Code does not tax the sale of service contracts but only taxes income received under such contracts.

The summary judgment in favor of the city is reversed, and the trial court is instructed to enter judgment in favor of ap-

pellant. Appellant will be awarded attorney's fees as requested upon filing a statement of costs pursuant to Rule 21(c), Rules of Civil Appellate Procedure, 17A A.R.S. (1986 Supp.), and *Schweiger v. China Doll Restaurant, Inc.*, 138 Ariz. 183, 673 P.2d 927 (App.1983).

HOWARD, P.J., and HATHAWAY, J., concur.