765 P.2d 566

**SASIADEK'S, INC., an Arizona corporation, Plaintiff/Appellant,**

**v.**

**CITY OF TUCSON, a municipal corporation, Defendant/Appellee.**

**No. 2 CA–CV 88–0177.**

Court of Appeals of Arizona, Division 2, Department B.

Dec. 8, 1988.

Bilby & Shoenhair, P.C. by Charles V. Harrington, Tucson, for plaintiff/appellant.

Frederick S. Dean, City Atty. by Elisabeth Sotelo, Tucson, for defendant/appellee.

## OPINION

LACAGNINA, Chief Judge.

Sasiadek's, Inc. appeals from an adverse judgment in favor of the City of Tucson, the trial court ruling that the taxes assessed on income from its maintenance contracts were proper. Sasiadek's argues that the maintenance agreements sold are insurance contracts and exempt from taxation under the Tucson City Code, and that the parts supplied and the performance of the maintenance contracts are nontaxable, inconsequential items of tangible personal property. The City argues Sasiadek's has a license to conduct business in retail sales which includes selling and servicing business equipment, and that its total income is taxable unless it separates the income from parts and labor when it sells the maintenance contracts. We agree with the City and affirm the judgment of the trial court.

## FACTS

Sasiadek's sells and services business equipment. It also sells maintenance agreements which provide for the repair and maintenance of business machines and equipment regardless of whether the machines or equipment were purchased from Sasiadek's.

The maintenance agreement provides for periodic inspections and cleaning when required. It also provides for planned parts replacement, a prorated refund for unavailable or obsolete parts, and no charge for pick up and delivery. The agreement is automatically renewed at the end of its term, subject to cancellation by either party upon thirty days' written notice. Each machine is placed under maintenance only after inspection and final approval of the service manager at the time of the first inspection. The agreement excludes the overhaul of any machine, and the repair of damage caused by the following: the use of supplies, other than normal office environment, or the misuse of machines for other than the use for which they were designed.

The contract price paid by the customer covers the cost of parts and labor. Sasiadek's accounts for maintenance agreements are kept separate from other transactions, but those accounts do not distinguish or separate parts from labor. During the taxable period involved, the parts supplied by Sasiadek's under its maintenance agreements were valued at approximately 3.3% of the gross receipts from the agreements.

## TAX ON THE MAINTENANCE AGREEMENT

The Tucson Code, tax regulation IIR17–35, imposes a tax on gross proceeds from sales of service contracts, and provides as follows:

IIR17–35. Warranty Maintenance and Service Contracts

A. Amounts received under warranty maintenance and service contracts are taxable subject to tax as retail sales or contracting as stated below:

1. Contracts providing for labor only are not taxable under retail.

2. Income from contracts providing for parts or materials only is taxable in full under retail.

3. Amounts received from contracts providing for both parts and labor are taxable in full under retail unless separate charges are made for labor and for parts or materials.

4. Income from maintenance contracts that are a continuation of a contracting activity, regardless of who performed the original construction,

shall be reported under contracting. (Examples—air conditioning and heating, solar systems, elevators.)

B. Amounts received by a dealer for work performed under a manufacturer's warranty are not taxable.

■ Sasiadek's first argues its maintenance agreements are insurance contracts and as such are exempt from taxation, citing our decision in *Jim Click, Inc. v. City of Tucson*, 154 Ariz. 48, 739 P.2d 1365 (App.1987). We disagree, because the principal object and purpose of Sasiadek's maintenance contract is service and not indemnity. *See Transportation Guarantee Co. v. Jellins*, 29 Cal.2d 242, 174 P.2d 625 (1946). The first sentence of the agreement states that its purpose is to "[r]educe and control costs of office machines service, while maintaining your machine in efficient operating condition." Sasiadek's agrees to inspect some machines under a pre-planned schedule, clean machines, replace worn parts, provide emergency service calls, loan machines if necessary, and pick up and deliver machines needing service and repair. In addition, Sasiadek's reserves the right in its agreement to cancel on 30 days' notice, to drop a machine from coverage if not overhauled and to omit a machine if parts are unavailable.

The only similarity between its contract and the contract in *Click* is the repair and replacement of a broken part, and in that event, only if the parts are available. In *Click*, we compared the contracts in *Transportation Guarantee v. Jellins*, with the *Click* contract and found that in *Jellins* the contractor performed all the necessary periodic maintenance on the vehicle plus replacement of parts. "There was no doubt the contractor would perform services and incur costs under the contract." 154 Ariz. at 51, 739 P.2d at 1368. This is similar to the contract in the case before us. The *Click* contract was significantly different. As we stated:

Click may never perform any services under some of the contracts and may perform only a few under others. No regular maintenance of any kind is covered by the contracts; indeed, the purchasers are required to produce maintenance records when replacement parts are requested to show that they have properly maintained the cars according to the manufacturer's schedules. The purchasers pay the cost of that required maintenance.

*Id.*

We agree with the City that the difference between the contract in *Click* and Sasiadek's maintenance agreement is the "distinction between contracts which called for regular maintenance, the responsibility for which was to be borne by the service contractor, and those where the responsibility for maintenance was to be borne by the service contract purchaser." In addition, the contract in *Click* was in essence an insurance contract. The purchaser paid a fixed "premium" in return for Click's assumption of a risk of loss, that is, the cost of replacing covered parts. In this case, however, the risk of loss, if any, is limited to certain types of malfunction, and the contract is essentially one for routine maintenance and repair.

■ The amounts received by Sasiadek's under its service contracts are taxable as retail sales or contracting pursuant to Tucson Code IIR17–35. Under that provision of the Code, a contractor can avoid a tax on amounts received for labor only if separate charges are made for labor and for parts. We reject Sasiadek's argument that at the time of sale of the agreement, it is impossible to determine the amount of labor or parts which will be necessary under a particular maintenance agreement and, therefore, it has complied with the exception by separating income from sales of maintenance agreements from other sales. The record before us shows that during the three-year period involved in this case, the income Sasiadek's received for parts supplied under the maintenance agreements amounted to 3.3% of the total amount received from the sale of maintenance agreements. A businessman with that historical data should be able to prepare an invoice allocating the amount received between labor and parts when the maintenance agreement is sold. When further experience in-

dicates a disparity between the amounts allocated at the time of sale of the maintenance contracts, the businessman could adjust future contracts, and in this way, the city tax would be due only on the small amount allocated for parts. There may be other ways to comply with the requirement that amounts received from service contracts be separated in order to avoid the tax on labor, and it is Sasiadek's burden to adopt a procedure which accomplishes the separation in order to avoid the tax on labor.

## TAX ON SALE OF TANGIBLE PERSONAL PROPERTY

 Sasiadek's further argues that even assuming the agreement is not construed as an insurance contract and therefore exempt from taxation, the parts supplied under the contracts are inconsequential transfers of tangible personal property because they account for only 3.3% of the amounts received from sale of service contracts, and are therefore exempt from taxation pursuant to Tucson City Code § 19–85.

Section 19–85(b) exempts from taxation "businesses which involve sales or transfers of tangible personal property only as inconsequential elements thereof." Sasia-dek's has a license to do business as a retail sales operation, and all of its income from sales is taxable under § 19–85. It is not engaged in the business of transferring tangible personal property as an inconsequential event. Its principal business activity is the sale of business machines, and the sale of maintenance contracts is incidental thereto. The exemption provided for in § 19–85(b) does not apply to amounts received to its retail sales business, including the sale of its service contracts. Tucson Code tax regulation IIR17–35 specifically taxes the entire income from service contracts subject to the exceptions which we have already decided did not apply to Sasiadek's when we rejected its argument that compliance was impossible.

We affirm the judgment of the trial court.

ROLL, P.J., and FERNANDEZ, J., concur.