2011 OK 7

**Harry McMULLAN, III,**
**Plaintiff/Petitioner,**

v.

**ENTERPRISE FINANCIAL GROUP,**
**INC., Defendant/Respondent.**

No. 108,241.

Supreme Court of Oklahoma.

Jan. 31, 2011.

Murray E. Abowitz, Daniel C. Hays, Licensed Legal Intern, Oklahoma City, OK, for Plaintiff/Petitioner McMullan.

Joe M. Hampton, Cara S. Nicklas, Oklahoma City, OK, for Defendant/Respondent Enterprise.

1. In the interim, we decided *Embry v. Innovative Aftermarket Systems*, 2010 OK 82, 247 P.3d 1158, in which we held that because the special relationship between contracting parties was like insurance, the contract need not be designated as an insurance contract in order to bring a claim for bad faith. Embry is pending rehearing. It held that the special relationship between the contracting parties supports bad faith as a theory

KAUGER, J.:

¶1 We granted certiorari to address the first impression question of whether a vehicle service contract meets the definition of an insurance contract.[1] We hold that it does.

## FACTS

¶2 On April 25, 2007, the plaintiff/petitioner, Henry McMullan, III (petitioner/buyer) purchased a 2004 Ford Mustang Cobra from a Hyundai dealership in Norman, Oklahoma. At the same time, he also purchased a vehicle service contract for $1800.00 from Enterprise Financial Group, Inc. (respondent/provider), a separate company. The service contract indemnified the buyer for certain repair costs if mechanical breakdowns occurred before 48 months or 50,000 miles, whichever happened first.

¶3 About six months after the service contract was purchased, the Mustang suffered a mechanical breakdown. The buyer submitted a claim to Enterprise, alleging that the breakdown was covered under the service contract, but it refused to pay the claim. On March 31, 2009, the buyer filed a lawsuit against Enterprise for breach of contract and bad faith breach of contract.[2] On February 19, 2010 Enterprise filed a motion for partial summary judgment arguing that the buyer was precluded from asserting a bad faith breach of contract claim because the service contract was not an insurance contract.

¶4 In an order filed April 5, 2010, the trial court granted the provider's motion for partial summary judgment finding that because the vehicle service contract was not an insurance contract, the provider was not subject to a bad faith breach of contract claim. This question of first impression was certified for immediate appeal to pursuant to 12 O.S.2001 § 952(b)(3).[3] We granted certiorari on June 7, 2010.

of recovery against the provider, regardless of whether the contract is labeled as "insurance."

2. It is unclear from the record whether the initial petition filed on March 31, 2009, included the bad faith claim. However, McMullan filed an amended petition on April 3, 2009, which clearly included the bad faith allegations.

3. Title 12 O.S.2001 § 952(b)(3) provides:

## ¶ 5 A VEHICLE SERVICE CONTRACT MEETS THE DEFINITION OF AN INSURANCE CONTRACT.

¶ 6 The petitioner relies on the public policy considerations of the Oklahoma Service Warranty Insurance Act, 36 O.S.2001 §§ 6601–6639, and the Oklahoma Insurance Code, 36 O.S.2001 § 1 *et seq.* to impose the duty of good faith. He argues that these statutes and the fact other jurisdictions have determined similar service contracts to be contracts of insurance support his argument that regardless of what these contracts are labeled, they are insurance contracts which may support a claim for bad faith breach. The provider counters that because vehicle service providers and insurance companies are regulated differently, and because the function and design of the service contracts resembles a warranty, a vehicle service contract does not resemble an insurance contract.

¶ 7 The Oklahoma Insurance Code (the Code), 36 O.S.2001 § 101 *et seq.*[4] defines insurance as "a contract whereby one undertakes to indemnify another or to pay a specified amount upon determinable contingencies."[5] Insurers are defined as "every person engaged in the business of making contracts of insurance or indemnity.[6]" (Nonprofit hospital service and medical indemnity corporations are expressly included within the definition of insurer.[7] Burial associations are expressly excluded from the definition of insurer.[8] Service warranty providers, such as Enterprise, are not mentioned at all.)[9]

¶ 8 "Indemnity" is not defined in the general provisions of the Code, but the Service Warranty Insurance Act,[10] which is located therein, defines indemnity as undertaking repair or replacement of a consumer product.[11] A consumer product is tangible personal property primarily used for personal purposes.[12] This portion of the Code also re-

b) The Supreme Court may reverse, vacate or modify any of the following orders of the district court, or a judge thereof:
... 3. Any other order, which affects a substantial part of the merits of the controversy when the trial judge certifies that an immediate appeal may materially advance the ultimate termination of the litigation; provided, however, that the Supreme Court, in its discretion, may refuse to hear the appeal. If the Supreme Court assumes jurisdiction of the appeal, it shall indicate in its order whether the action in the trial court shall be stayed or shall continue.

4. Title 36 O.S.2001 § 101 provides:
Title 36 of the Oklahoma Statutes shall be known and may be cited as the Oklahoma Insurance Code.

5. Title 36 O.S.2001 § 102 provides:
'Insurance' is a contract whereby one undertakes to indemnify another or to pay a specified amount upon determinable contingencies.

6. Title 36 O.S.2001 § 103 provides:
A. "Insurer" includes every person engaged in the business of making contracts of insurance or indemnity.
B. A nonprofit hospital service and medical indemnity corporation is an insurer within the meaning of this Code.
C. Burial associations shall be deemed not to be insurers.
*See also,* 36 O.S.2001 § 309.1.

7. *Id.*

8. *Id.*

9. *Id.*

10. Title 36 O.S. Supp.2009 § 6596 provides:
Sections 6601 through 6639 of this title shall be known and may be cited as the "Service Warranty Insurance Act".
Prior to 2009, the statute referred to sections 1 through 39 but this was corrected in 2009.

11. Title 36 O.S. Supp.2004 § 6602 provides in pertinent part:
As used in the Service Warranty Insurance Act:
... 7. "Indemnify" means to undertake repair or replacement of a consumer product or a newly-constructed residential structure, including any appliances, electrical, plumbing, heating, cooling or air conditioning systems, in return for the payment of a segregated premium, when the consumer product or residential structure becomes defective or suffers operational failure; ...
This statute has been amended in 2007, 2008, 2009, and 2010, but the pertinent portions remain unchanged.

12. Title 36 O.S. Supp.2004 § 6602 provides in pertinent part:
As used in the Service Warranty Insurance Act:
... 2. "Consumer product" means tangible personal property primarily used for personal, family, or household purposes; ...
This statute has been amended in 2007, 2008, 2009, and 2010, but the pertinent portions remain unchanged.

defines insurers as any property or casualty insurer duly authorized to transact business in this state and service warranty associations as any person, other than an insurer, who issues service warranties.[13] Service warranties are contracts between a consumer and a service warranty association in which agreements to indemnify against the cost of repair or a replacement of a consumer product is undertaken.[14] Maintenance service

13. Title 36 O.S. Supp.2004 § 6602 provides in pertinent part:

As used in the Service Warranty Insurance Act: ... 9. "Insurer" means any property or casualty insurer duly authorized to transact such business in this state; ... This statute has been amended in 2007, 2008, 2009, and 2010, but the pertinent portions remain unchanged.

14. Title 36 O.S. Supp.2004 § 6602 provides in pertinent part:

... 14. "Service warranty" means any warranty, home warranty, guaranty, extended warranty or extended guaranty, contract agreement, or other written promise entered into between a consumer and a service warranty association under the terms of which there is an undertaking to indemnify against the cost of repair or replacement of a consumer product or newly-constructed residential structure, including any appliances, electrical, plumbing, heating, cooling or air conditioning systems, in return for the payment of a segregated charge by the consumer; however:
a. maintenance service contracts under the terms of which there are no provisions for such indemnification are expressly excluded from this definition,
b. those contracts issued solely by the manufacturer, distributor, importer or seller of the product, or any affiliate or subsidiary of the foregoing entities, whereby such entity has contractual liability insurance in place, from a company licensed in the state, which covers one hundred percent (100%) of its claims exposure on all contracts written without being predicated on the failure to perform under such contracts, are expressly excluded from this definition,
c. the term "service warranty" does not include service contracts entered into between consumers and nonprofit organizations or co-operatives the members of which consist of condominium associations and condominium owners, which contracts require the performance of repairs and maintenance of appliances or maintenance of the residential property, and
d. the term "service warranty" does not include warranties, guarantees, extended warranties, extended guarantees, contract agreements or any other service contracts issued by a company which performs at least seventy percent (70%) of the service work itself and not through subcontractors, which has been selling and honoring such contracts in Oklahoma for at least twenty (20) years, or which has net assets in excess of One Hundred Million Dollars ($100,000,000.00); ...

The statute was amended in 2007, 2008, 2009 and 2010. The current version of this portion of the statute provides:
14. "Service warranty" means a contract or agreement for a separately stated consideration for a specific duration to perform the repair or replacement of property or indemnification for repair or replacement for the operational or structural failure due to a defect or failure in materials or workmanship, with or without additional provision for incidental payment of indemnity under limited circumstances, including, but not limited to, failure due to normal wear and tear, towing, rental and emergency road service, road hazard, power surge, and accidental damage from handling or as otherwise provided for in said contract or agreement; however:
a. maintenance service contracts under the terms of which there are no provisions for such indemnification are expressly excluded from this definition,
b. those contracts issued solely by the manufacturer, distributor, importer or seller of the product, or any affiliate or subsidiary of the foregoing entities, whereby such entity has contractual liability insurance in place, from an insurer licensed in the state, which covers one hundred percent (100%) of the claims exposure on all contracts written without being predicated on the failure to perform under such contracts, are expressly excluded from this definition,
c. the term "service warranty" does not include service contracts entered into between consumers and nonprofit organizations or co-operatives the members of which consist of condominium associations and condominium owners, which contracts require the performance of repairs and maintenance of appliances or maintenance of the residential property,
d. the term "service warranty" does not include warranties, guarantees, extended warranties, extended guarantees, contract agreements or any other service contracts issued by a company which performs at least seventy percent (70%) of the service work itself and not through subcontractors, which has been selling and honoring such contracts in Oklahoma for at least twenty (20) years, and
e. the term "service warranty" does not include warranties, guarantees, extended warranties, extended guarantees, contract agreements or any other service contracts, whether or not such service contracts otherwise meet the definition of service warranty, issued by a company which has net assets in excess of One Hundred Million Dollars ($100,000,000.00). A service warranty association may use the net assets of a parent company to qualify under this section if the net assets of the company

contracts which do not provide indemnification are expressly excluded from the definition of "service warranty." [15]

¶ 9 Neither the Act nor the Code expressly refers to service warranty agreements as insurance contracts, but the Act requires: 1) the state Insurance Commissioner to regulate both service warranty associations and insurance companies in a similar manner through licensing, collecting fees, etc.; [16] 2) the treatment of service warranty associations as insurers for service of process purposes; [17] and 3) to indemnity themselves of losses [18] by either maintaining a funded reserve account or obtaining liability insurance.[19]

issuing the policy total at least Twenty-five Million Dollars ($25,000,000.00) and the parent company maintains net assets of at least Seventy-five Million Dollars ($75,000,000.00) not including the net assets held by the service warranty associations;

**15.** *Id.*

**16.** Title 36 O.S. Supp.2006 § 301, 36 O.S.2001 § 606.1; 36 O.S. Supp. 202 § 610; 36 O.S.2001 § 6603; Title 36 O.S. Supp.2009 § 6604; 36 O.S. Supp.2010 § 6607. These statutes have been amended several times since the consumer purchased the vehicle service contract from Enterprise, however, because the changes are not dispositive of the issues, references are to the current version.

**17.** Title 36 O.S.2001 § 6618 provides:

Service warranty associations are subject to service of process in the same manner and subject to the same terms, conditions, and fees as apply to insurers.

**18.** *Mid–Continent Life Ins. Co. v. Atlas Life Ins. Co.*, 1936 OK 149, ¶ 13, 54 P.2d 601 defines reinsurance as:

"Reinsurance, as previously stated, is a contract whereby one for a consideration agrees to indemnify another, either in whole or in part, against loss or liability the risk of which the latter has assumed under a separate and distinct contract as insurer of a third party. With respect to the nature of the contract, it may safely be said that, although the decisions show a difference in many respects between the contract of insurance and one of reinsurance, as a matter of fact the latter involves no contracts generally. Furthermore, a contract of reinsurance does not necessarily differ in form from one of original insurance. Nor is it doubted that a contract of reinsurance, whatever it may be termed or however it may be designated, must be construed in the light of its provisions. It also is worthy of note that the contract is one not of guaranty, but of indemnity.

**19.** Title 36 O.S.2001 § 6607 provides in pertinent part:

A. An association licensed pursuant to the Service Warranty Insurance Act shall maintain a funded, unearned premium reserve account, consisting of unencumbered assets, equal to a minimum of twenty-five percent (25%) of the gross written premiums received on all warranty contracts in force, wherever written. In the case of multiyear contracts which are offered by associations having net assets of less than Five Hundred Thousand Dollars ($500, 000.00) for which premiums are collected in advance for coverage in a subsequent year, one hundred percent (100%) of the premiums for such subsequent years shall be placed in the funded, unearned premium reserve account.

B. An association shall not be required to establish an unearned premium reserve if it has purchased contractual liability insurance which demonstrates to the satisfaction of the Insurance Commissioner that one hundred percent (100%) of its claim exposure is covered by such policy. The contractual liability insurance shall be obtained from an insurer that holds a certificate of authority to do business within the state or from an insurer approved by the Commissioner as financially capable of meeting the obligations incurred pursuant to the policy....

The current version of the statutes provides:

A. An association licensed pursuant to the Service Warranty Insurance Act shall maintain a funded, unearned premium reserve account, consisting of unencumbered assets, equal to a minimum of twenty-five percent (25%) of the gross written premiums received on all warranty contracts in force, wherever written. In the case of multiyear contracts which are offered by associations having net assets of less than Five Hundred Thousand Dollars ($500, 000.00) for which premiums are collected in advance for coverage in a subsequent year, one hundred percent (100%) of the premiums for such subsequent years shall be placed in the funded, unearned premium reserve account. Additionally, an association establishing such reserve account shall also place in trust with the Insurance Commissioner a surety bond issued by an authorized surety having a value of not less than five percent (5%) of the gross premium received, less claims paid, on the sale of the service warranties for all service contracts issued and in force in this state, but in no event shall the bond be less than Twenty-five Thousand Dollars ($25,000.00).

B. An association shall not be required to establish an unearned premium reserve or demonstrate the minimum writing ratio required by subsection D of this section if it has purchased an insurance policy which demonstrates to the satisfaction of the Insurance Commissioner that one hundred percent

¶ 10 Public policy reasons exist for legislatures to require a more extensive regulation of insurance companies than service warranty companies. For instance, although service warranty associations involve a risk of loss, they are not subject to risks as large as or at the same monetary level as insurance companies. Consequently, they are frequently subjected to much less stringent regulation than insurance companies.[20] Nevertheless, the extent of regulation is not what makes a service provider an "insurance company" nor is it what makes a service agreement an "insurance" contract.

¶ 11 The United States Supreme Court in *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 210, 228, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979),[21] in discussing whether a contract was merely an arrangement for the purchase of goods and services or whether it constituted "insurance," said:

... The primary elements of an insurance contract are the spreading and underwriting of a policyholder's risk. "It is characteristic of insurance that a number of risks are accepted, some of which involve losses, and that such losses are spread over all the risks so as to enable the insurer to accept each risk at a slight fraction of the possible liability upon it.... (Citations omitted.)

¶ 12 The Court, quoting *Jordan v. Group Health Assn.*, 71 App. D.C. 38, 107 F.2d 239 (1939), also stated:

(100%) of its claim exposure is covered by such policy and satisfies the requirements of this section. The insurance shall be obtained from an insurer that is licensed, registered, or otherwise authorized to do business in this state, that is rated B++ or better by A.M. Best Company, Inc., and that meets the requirements of subsection C of this section. For the purposes of this subsection, the insurance policy shall contain the following provisions: ...

20. The overall purpose of service contract regulation is to help minimize the risk to consumers and to ensure the consumer's assumptions are realized. As with insurance, service contracts present a tremendous potential for abuse and fraud. Service contracts are now a major element of new car sales. Spahn, Kenneth E., *Service Warranty Associations: Regulating Service Contacts as "Insurance" Under Florida's Chapter 634*, 25 Stetson L.Rev. 597, 598–99 (1996). Service warranty associations take steps to characterize their contracts as warranties rather than insurance to remove the wrath of the ominous

... Whether the contract is one of insurance or of indemnity there must be a risk of loss to which one party may be subjected by contingent or future events and an assumption of it by legally binding arrangement by another. Even the most loosely stated conceptions of insurance ... require these elements. Hazard is essential and equally so a shifting of its incidence ...

¶ 13 Vehicle service contracts are written like insurance policies. The obvious purpose of a vehicle service contract is to protect the purchaser from the expenses associated with an unexpected mechanical breakdown, or an expensive but necessary repair. The purchaser pays a premium and buys an agreement to shift any potential hazard they may face to the vehicle service provider. The vehicle service provider agrees to indemnify the consumer for mechanical repair costs. In other words, the consumer has purchased insurance—regardless of whether the vehicle service company is labeled as an insurance company and regardless of whether it labels its agreements insurance.

¶ 14 While many states have statutorily regulated service contract providers, relatively few courts have decided the issue of whether a vehicle service contract is insurance—and the courts that have are split on the issue.[22] One court has held that such

insurance regulations, but extended warranties are really insurance policies and as a result similar policy problems that arise with insurance contracts also arise with warranties. Samini, Keyvan, *Third Party Extended Warranties and Service Contracts: Drawing the Line Between Insurance and Warranty Agreements*, 54 Ohio St. L.J. 537–538 (1993).

21. *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 210, 228, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979) involved the interpretation of the business of insurance under the McCarran–Ferguson Act, but its discussion of insurance generally is instructive.

22. In addition to those cases discussed, there are court which have decided the issue in various contexts. For example, in *Guaranteed Warranty Corp., Inc. v. State of Arizona ex rel. Humphrey*, 23 Ariz.App. 327, 533 P.2d 87, 90 (1975), the court held that a warranty agreement for televisions constituted an insurance contract in which

contracts did not "substantially amount to insurance" so that the provider would be subject to the same regulations as insurance. In *Griffin Systems, Inc. v. Ohio Department of Insurance*, 61 Ohio St.3d 552, 575 N.E.2d 803 (1991), the Ohio Supreme Court determined that such plans are warranties because:

> 1) A contract for insurance promises to cover losses or damages over and above, or unrelated to, defects with the product itself; and

> 2) The vehicle protection plan expressly excluded losses or damages sustained by the purchaser of the product which are unrelated to the product itself.[23]

¶ 15 However, the contrary view that vehicle service contracts should be treated as insurance is set forth in *Jim Click Ford, Inc. v. City of Tucson*, 154 Ariz. 48, 739 P.2d 1365, 1367 (1987). The question in Ford was whether service vehicle contracts were insurance and thus exempt from taxation under state tax statutes. In determining whether the service contracts were insurance, the court recognized five determinative elements of an insurance contract, including:

1. An insurable interest;
2. A risk of loss;
3. An assumption of the risk by the insurer;
4. A general scheme to distribute the loss among the larger group of persons bearing similar risks; and
5. The payment of a premium for the assumption of risk.

¶ 16 In its analysis of those five elements, the *Ford* court concluded that: 1) the purchasers of vehicle service contracts had an insurable interest in the automobiles which the contracts covered; 2) they had a risk of loss if one of the listed parts malfunctioned; 3) the vehicle service provider assumed the risk and replaced the parts involved; and 4) the loss was distributed among a larger group with similar risks, because it is obvious that some of the purchasers will require a large number of replacement parts and services during the contract term, while there are others who may not require any and some who may require only a few; and 5) a premium (the purchase price of the contract) was paid in exchange for vehicle service provider's assumption of the risk of loss. Clearly, the five elements of an insurance contract were present in the vehicle service contracts.

¶ 17 In *Pugh v. North American Warranty Services*, 2000 UT App 121, ¶ 16, 1 P.3d 570 (2000), the Utah Court of Appeals determined that a vehicle service agreement was an insurance contract for the purpose of allowing an award of fees as consequential damages when the provider breached the implied covenant to perform in good faith. The *Pugh* court reasoned that the sole purpose of the contract was to shift the risk of financial loss due to vehicle breakdown from the consumer to the service contract provider. The consumer paid for and was entitled to peace of mind. If the car broke down during the warranty period, the provider absorbed the cost of the repair, thus the contract, although styled as a vehicle service

the defendant could not sell without a license, and such an agreement constituted an insurance contract. Other courts have reached similar results. *Riffe v. Home Finders Associates, Inc.*, 205 W.Va. 216, 517 S.E.2d 313, 318 (1999) [A home warranty contract to recover for breach of contract and bad faith denial of the claim was insurance.]. The opposite view has been taken in the following contexts as well: *In re First Assured Warranty Corp.*, 383 B.R. 502 (D.Colo. 2008) [Debtor which sold extended automobile service warranties did not constitute "domestic insurance company" for bankruptcy purposes.]; *H & R Block Eastern Tax Services, Inc. v. State of Tennessee, Dept. of Commerce & Ins.*, 267 S.W.3d 848, 858–859 (Tenn.Ct.App.2008) [Enhanced guarantee program was not contract for insurance.]; *In re Automotive Professionals, Inc.*, 379 B.R. 746 (N.D.Ill.2007)[Service vehicle contract

provider was not classified as domestic insurance company and was not substantially equivalent to insurance company.]; *Boyle v. Orkin Exterminating Co.*, 578 So.2d 786, 787 (Fla.App. 1991) [Lifetime termite damage guarantee was not a contract of insurance.]; *Rayos v. Chrysler Credit Corp.*, 683 S.W.2d 546, 548 (Tex.App.1985) [Buyer protection plan was more of a nature of warranty than insurance.].

**23.** In *Pistone v. Superior Court of Contra Costa County; New Car Dealer Associates*, 228 Cal. App.3d 672, 279 Cal.Rptr. 173 (1991) an automobile purchaser brought an action against a vehicle service provider and the court determined that the question of whether the vehicle provider administrator was selling insurance was a question of fact.

contract rather than as automobile repair insurance, served the same purpose as an insurance contract.

¶ 18 Oklahoma's statutory scheme, like Ohio's in Griffin, supra, may not regulate vehicle service providers with the same regulations as it does insurance companies. However, we find the rationale of both *Ford,* supra, and *Pugh,* supra, persuasive. The purpose of the contract is to provide indemnity and shift risk—it just does so on a smaller scale and with less financial responsibility than an insurance contract might provide. The contract meets the statutory definition of insurance as "a contract whereby one undertakes to indemnify another or to pay a specified amount upon determinable contingencies."[24] Accordingly, we hold that a vehicle service contract which meets the definition of and is designed to function and perform as "insurance" should be treated like any other insurance contract if it is breached.

## CONCLUSION

¶ 19 Although vehicle service providers may not be subject to the exact same requirements and regulations as insurance providers, vehicle service contracts meet the definition of and are designed to function and perform as "insurance." The consumer pays for indemnity and pays to shift the risk of paying for high repair costs to the vehicle service provider in exchange for a pre-paid premium. Because these contracts function like insurance, their providers should be subject to the same covenants of good faith that insurers must meet. However, we express no opinion on the merits of the bad faith claim as applied to the facts of this case, that question is for the fact finder to resolve.

**REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.**

COLBERT, V.C.J., KAUGER, WATT, EDMONDSON, REIF, COMBS, JJ., concur.

TAYLOR, C.J., WINCHESTER, J., dissent.

24. Title 36 O.S.2001 § 102 see note 5, supra.